2018 IL App (2d) 160118
No. 2-16-0118
Opinion filed October 4, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-313 |
| BARAKA OLLA, | ) ) | Honorable James C. Hallock, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Baraka Olla, appeals his convictions of one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) and four counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)).  He contends that the trial court plainly erred in its questions to prospective jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) because (1) the court failed to inquire whether the jurors understood the principles listed in the rule and (2) the evidence was closely balanced.  He also contends that the State impermissibly shifted or lessened the burden of proof during closing argument.  We affirm.

¶ 2                              I. BACKGROUND

¶ 3    Defendant was charged with two counts of predatory criminal sexual assault of a child and multiple counts of aggravated criminal sexual abuse, which alleged that he engaged in various acts with his stepdaughter, A.F., when she was under the age of 13. Before trial, in relation to the State's motion to allow A.F.'s statements at trial, A.F.'s mother, Tawanda, and an investigator, Kathy Byrne, testified about things that A.F. told them. The trial court granted the motion.

¶ 4    During *voir dire*, the trial court asked the prospective jurors as a group whether they "have any problem or take issue with" the concept that a person is presumed innocent. The court also asked if anyone took issue with the concept that the State had the burden to prove defendant guilty beyond a reasonable doubt, that defendant was not required to testify, and that the decision not to testify could not be held against him. In each instance, the court noted that no one raised their hand. The prospective jurors were not asked whether they understood the concepts. During opening statements, the defense focused on inconsistencies in A.F.'s stories of the events, stating that the jury would hear that she gave inconsistent accounts.

¶ 5    At trial, A.F. testified that she was currently 13. When asked if she remembered the first time something happened between her and defendant, she said "[a] little." A.F. said that she was in the living room with defendant watching television and that defendant pulled down her pants and underwear. A.F. told him that "my mom said that nobody can touch my private," and he responded that it was okay. She initially testified that she did not remember anything after that, but when specifically asked what happened when defendant pulled her pants down, she said that he "humped" her, with his "private" touching hers. She said that she could feel his "private" and that it was hard, but she did not recall whether he had his clothes on. Defendant told her that she was beautiful and that he loved her. He stopped when he heard a noise, and he told her to go

wash up and put her clothes back on. When asked what the television show was, she responded that it was "The Walking Dead." She was about nine when the incident happened, and she was able to place the time frame in part based on where the sofa was in the room, although other evidence at trial indicated that the room was rearranged often. When asked if defendant "humped" her at other times, A.F. said that he did so in the living room. On cross-examination, A.F. said that she did not describe the "humping" to her mother as "dry humping." She also said that she did not remember whether her clothes or defendant's clothes were on. She said that, when she talked to Byrne, she could not remember the show that she had been watching, but she recently remembered it.

¶ 6    A.F. testified about another incident that happened in the bedroom of her brother, T.F. A.F. was home sick from school and was lying on the bed when defendant came in and wrapped his arm around her. He lay there for a few minutes and then left. A.F. was in fourth grade at the time.

¶ 7    A.F. recounted another time when she was in her mother's bedroom, lying on the bed, when defendant came in, pulled down her pajama pants, and licked the inside of her "private." A.F. told him to stop, but he did not. He also took her shirt off and touched her chest with his hand. She testified that he never touched her chest with any other part of his body.

¶ 8    A.F. also testified about another incident in her mother's bedroom during which defendant took her hand and placed it on his "private." It was hard, defendant moved her hand up and down on it, and "white stuff" came out. A.F. could not remember some details of the event, such as who took defendant's pants off, why she had been in the room, or if anyone else was home. She could not remember where the "white stuff" went or remember telling Byrne that it went on the bed or on her "private hair."

¶ 9    On another occasion, defendant met A.F. at her school bus stop and told her that he was taking her to McDonald's. However, he took her home and told her to go upstairs, take her clothes off, and get into her mother's bed. Instead, she put on her pajamas and she got into her own bed. She could not remember if defendant came to her room, but she said that he did not touch her that day.

¶ 10    A.F. testified that she used to play "school" with her siblings, with defendant as the principal. She testified about a time when defendant told her to come into the living room, lifted up her dress, removed her underwear, and "humped" her with his "private" touching hers. He also touched her "private" with his hand, by opening the "flaps" around it.

¶ 11    Tawanda was not usually home when A.F. arrived home from school. Sometimes defendant was there until he left for his job. Defendant told A.F. not to tell anybody about what happened between them, and he gave her money to stay quiet about it. She eventually told Tawanda about it because she wanted it to stop. She went to Tawanda and told her, " 'Dad raped me,' " and told her everything that he had done. Tawanda threw defendant out of the house and took A.F. to the police station. A.F. later spoke to Byrne and also told her everything.

¶ 12    During cross-examination, defense counsel asked if A.F. told Tawanda or Byrne about various other incidents that she said she did not remember, but she said that, if they had happened, she would have told Tawanda and Byrne. She was also asked about various statements she made to Tawanda about details of the incidents, but she could not remember them. When asked if defendant ever put his "private" in her mouth, A.F. said "[n]o" and that she never told Tawanda or Byrne that he did. She also did not tell Byrne that defendant "dry humped" her, as she did not know what "dry humping" was. When asked specifically how many times defendant put his mouth on her "private," she said two times. She could not remember the

number of times that defendant's "private" touched hers or telling Byrne that it happened one time. A.F. also did not remember telling Tawanda about a time when she and her sister were lying on a bed watching a movie with defendant and, when T.F. walked in, defendant jumped up and left the house.

¶ 13 Tawanda testified about the things that A.F. told her. A.F. initially told her that " 'Dad raped me.' " Tawanda then allowed A.F. to tell her what happened and did not interrupt her. However, Tawanda testified to details and events that A.F. did not testify to.

¶ 14 In regard to the first incident in the living room, Tawanda said that A.F. told her that defendant pulled her pants down and "licked her privates" by pulling the "flabby lips apart" and licking "the little ball *** between the flabby lips." In regard to the incident in which defendant picked up A.F. at the bus stop, Tawanda testified that A.F. told her that, after she went upstairs and put on her pajamas, defendant carried her into Tawanda's bedroom and tried to remove her pants but was unable to do so because A.F. was kicking and saying no. Defendant then angrily left. As to the "school" incident, A.F. told Tawanda that defendant also licked her "privates" on that day. A.F. also told Tawanda about an incident in which she was lying on a bed with defendant and her younger sister and could feel defendant's penis through his clothes, poking her behind. Tawanda testified that T.F. told her that, when T.F. entered the room, defendant jumped up and left the house. Tawanda asked A.F. if defendant ever put his penis in her mouth, and she said "yes." Tawanda did not recall A.F. telling her that defendant "humped" her or "dry humped" her and did not recall telling that to Byrne. She also did not recall A.F. telling her that defendant's "private" touched hers or that defendant made A.F. touch his "private" and "white stuff" came out.

¶ 15    After A.F. told Tawanda about the incidents, Tawanda grabbed defendant off of the couch and said " 'You've been licking my daughter?' "  Her three daughters were there at the time, and defendant looked at A.F. and said her name.  Tawanda made him leave and took away his keys.  During the time of the incidents, A.F. was very aggressive to her brother.  After she told Tawanda what happened, she became more pleasant.  Tawanda was impeached with a prior conviction of contributing to the delinquency of a minor for directing her son to beat up another child.

¶ 16    T.F. testified about the incident where he walked in while A.F. was watching television on the bed with defendant and her younger sister.  He said that he knocked on the door and that defendant told him to come in.  He entered the room to ask defendant a question and saw defendant lying with his front side against A.F.'s backside.  Defendant got up and stepped out of the room, and T.F. followed him into the kitchen in order to ask his question.  Defendant did not leave the house.  T.F. said that A.F. had a "bipolar" relationship with defendant in which at times she would want to play video games with him and at other times she would say that she could not stand being in his presence.  He also said that defendant would frequently call him to ask what time he would be home from school.  A.F. was aggressive toward T.F. at times, but their relationship improved after defendant left.

¶ 17    Byrne testified about her qualifications and interview techniques, by which she allows the child to describe what happened in their own words.  However, Byrne noted that A.F. used the term " 'hump' " while Byrne used the term " 'dry hump.' "  Byrne did not feel that her addition of the word "dry" had any effect on A.F's explanation of what occurred.  She also stated that Tawanda used the term "dry humped" with her.  Byrne stated that interviews are generally short because children have short attention spans and the topic is extremely upsetting.

¶ 18    Byrne's interview with A.F. was recorded and shown to the jury. In it, A.F. told Byrne that, during the first incident, defendant "humped" her and licked her "private." In regard to the school bus incident, she said that defendant told her to go upstairs, take her clothes off, and get in her mother's bed. She said that she changed into her pajamas and that defendant picked her up and put her on her mother's bed and "humped" her. A.F. also generally stated that defendant had previously touched her breasts, "humped" her from behind, and moved her hand on his "private" until "white stuff" came out. She estimated that incidents involving "white stuff" happened 3 times, that defendant "humped" her around 10 times, and that he put his mouth on her "private" a couple of times. She said that defendant's "private" touched hers one time.

¶ 19    On cross-examination, the defense asked Byrne about various incidents to illustrate omissions or inconsistencies among the witnesses' testimony. For example, A.F. did not tell Byrne the name of the television show that she was watching during the first incident, the layout of the room, or that defendant stopped when he heard a noise. A.F. also did not describe the pajamas she was wearing on the day of the school bus incident or say that defendant never touched her on that day. Instead, she said that defendant "humped" her on that day. She did not provide details of what happened on the day she was home sick from school. She also did not describe the "school" incident or the incident in which T.F. entered the room, but Byrne also did not ask A.F. about those incidents. However, Byrne did ask whether anyone ever almost saw what happened, such as whether anyone walked into the bedroom during an incident, and A.F. said "[n]o."

¶ 20    Byrne said that defendant was cooperative during the investigation. An expert in sexual assault and examination of children testified that A.F.'s physical examination was normal, which did not rule out sexual assault or abuse but did not prove it either.

¶ 21    Defendant testified.  He worked nights, and normally A.F. was his alarm clock in that she would wake him when she got home from school so that he could go to work.  She would also use his phone to call Tawanda to let her know that she was safely home.  Defendant specifically denied all of the allegations.  In regard to some allegations, he provided additional details.  For example, in regard to the "school" incident, he said that he did not wish to play the game and gave the children "detention" so that they would leave him alone.  He said that he once told A.F. that she was beautiful and was not fat in response to something A.F. told Tawanda.  He said that he once went to McDonald's and saw A.F. near the bus stop and gave her a ride home, but he did not go inside with her or touch her.  Defendant initially said that he did not recall lying on a bed with A.F. but later said that he recalled A.F. and her sister coming in when he was asleep and asking to watch a show on his phone.  The noise from the phone kept him from sleeping so he left the room.  Defendant said that he was probably home when A.F. was sick, but he could not remember for sure.  He recalled reprimanding A.F. but did not remember specifics and did not suggest that discipline would cause A.F. to lie.  He said that, when Tawanda confronted him, he asked her what she was talking about and, after Tawanda kicked him out, he tried to call her, but she would not answer the phone.  The defense also presented evidence that defendant was cooperative with investigators.

¶ 22    During closing arguments, the State made the following argument without objection from the defense:

> "Look at the language.  At 11 years old in that video, the language that she used: White stuff came out of him; opened my flaps; his private and my private; the ball in the middle.

Even the word ' "hump." ' How does the 11-year-old know what white stuff coming out is—which we as adults know is ejaculation—at 11 unless she has seen it?

You heard no evidence that she's watching R-rated movies. You heard no evidence that she heard it from kids on the playground. You have no evidence.

How does she know unless it happened to her? Her terms: Opened the flaps; the ball in the middle; his private; my private. She's not using words that an adult told her to use."

The State also argued: "Where is her motive to lie? Where is your evidence of why she told this horrible story? You haven't heard any evidence of that because there isn't any."

¶ 23 The State later argued in rebuttal over objection that "beyond a reasonable doubt is a burden that we welcome" and that it was used on a daily basis in courtrooms across the country. The State then repeated: "We welcome that burden, and we have proven this defendant guilty beyond a reasonable doubt."

¶ 24 The jury was instructed on defendant's presumption of innocence, the State's burden to prove defendant guilty beyond a reasonable doubt, and that arguments of counsel were not evidence. During deliberations, the jurors asked for the definition of reasonable doubt, and the court told them that they had all of the information and evidence and were to keep deliberating. The jurors also asked to view the video of A.F.'s interview with Byrne, and it was played in the courtroom for them. The jurors next sent a note stating that they were hung, and the court told them to keep deliberating. The jury then found defendant not guilty of one count of predatory criminal sexual assault of a child ("mouth in sex organ") and five counts of aggravated criminal sexual abuse ("mouth on breast," "penis on sex organ," "penis [on] buttock," and two counts of "victim's hand on penis"). They found him guilty of the remaining counts of aggravated

criminal sexual abuse ("victim's hand on penis," "hand on breast," "penis on sex organ," and "hand on sex organ") and one count of predatory criminal sexual assault of a child ("mouth in sex organ"). Defendant's motion for a new trial was denied, and he was sentenced to 10 years' incarceration for predatory criminal sexual assault of a child and 3 years for each count of aggravated criminal sexual abuse. His motion to reconsider the sentence was denied, and he appeals.

¶ 25                                    II. ANALYSIS

¶ 26    Defendant first contends that the trial court failed to comply with Rule 431(b) because, although the court inquired whether the prospective jurors agreed with the principles set forth in the rule, it failed to inquire whether they understood those principles. Defendant concedes that he forfeited the issue by failing to raise it in the trial court but argues that it is plain error requiring reversal because the evidence was closely balanced.

¶ 27    To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The plain-error doctrine allows a reviewing court to consider unpreserved error where either (1) a clear or obvious error occurs and the evidence is so closely balanced that such error threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and is so serious that it affects the fairness of the defendant's trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). In both instances, the burden of persuasion remains on the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005) (citing *People v. Hopp*, 209 Ill. 2d 1, 12 (2004)). The first step in conducting plain-error review is to determine whether error occurred at all. *Walker*, 232 Ill. 2d at 124.

¶ 28    Rule 431(b) contains the four commonly known "*Zehr* principles."  See *People v. Zehr*, 103 Ill. 2d 472, 477 (1984).  It provides:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects."  Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 29    The court's method of inquiry shall provide each prospective juror an opportunity to respond to specific questions concerning the principles set out in the rule.  *Id.*  The trial court must ensure that each prospective juror both understands and accepts each of the four principles. *People v. Belknap*, 2014 IL 117094, ¶¶ 44-46; *People v. Wilmington*, 2013 IL 112938, ¶ 32; *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).  The questions may be asked of the prospective jurors individually or by group, but in either event, Rule 431(b) contemplates " 'a specific question and response process.' "  *Wilmington*, 2013 IL 112938, ¶ 32 (quoting *Thompson*, 238 Ill. 2d at 607).  It is error for the trial court to ask the prospective the jurors whether they agree with the principles but fail to also ask whether they understand them.  *Belknap*, 2014 IL 117094, ¶ 46; *People v. Daniel*, 2018 IL App (2d) 160018, ¶ 24.

¶ 30    Here, the court asked only whether the prospective jurors had a problem with, or took issue with, the principles.  The State concedes that this violated Rule 431(b), and we agree.  The question, then, is whether it was plain error.

¶ 31    "A Rule 431(b) violation is not cognizable under the second prong of the plain-error doctrine absent evidence that the violation produced a biased jury." *Daniel*, 2018 IL App (2d) 160018, ¶ 26 (citing *People v. Sebby*, 2017 IL 119445, ¶ 52).  Defendant does not contend that the error produced a biased jury and argues only that the evidence was closely balanced under the first prong of the doctrine.

¶ 32    "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53.  "That standard seems quite simple, but the opposite is true.  A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

¶ 33    In *Sebby*, the defendant was charged with felony resisting a peace officer (720 ILCS 5/31-1(a-7) (West 2010)). *Sebby*, 2017 IL 119445, ¶ 1.  That charge required the State to prove in part that the defendant knowingly resisted a peace officer and that his resistance was the proximate cause of an injury to that officer.  720 ILCS 5/31-1(a-7) (West 2010).  On the resistance element, the three responding officers testified that the defendant resisted. *Sebby*, 2017 IL 119445, ¶¶ 55-56.  Three other witnesses, including the defendant, testified that the defendant did not resist and was instead being yanked around by the officers. *Id.* ¶¶ 57-58.

¶ 34    The *Sebby* court concluded that the evidence was closely balanced. *Id.* ¶ 61.  The court observed that the State's witnesses provided accounts that were consistent with each other, as did the defendant's witnesses. *Id.*  Neither party's version of events was fanciful. *Id.*  The court rejected the State's argument that the testimony of the defendant's witnesses was less plausible because those witnesses were relatives or friends of the defendant and might be biased. *Id.* ¶ 62.

The court also noted that neither party's version of the events was corroborated by extrinsic evidence. *Id.* The court found that, as in *People v. Naylor*, 229 Ill. 2d 584 (2008), the outcome of the trial depended on a " 'contest of credibility' " between the officers and the defendant. *Sebby*, 2017 IL 119445, ¶ 63 (quoting *Naylor*, 229 Ill. 2d at 606-07). The court explained that, because the outcome depended on a choice between two versions that were both credible, the evidence was closely balanced. *Id.* (citing *Naylor*, 229 Ill. 2d at 608). Recently, in *Daniel*, we applied *Sebby* and found the evidence to be closely balanced when witnesses for the State and witnesses for the defense gave plausible opposing versions of the events, neither of which was corroborated by extrinsic evidence. *Daniel*, 2018 IL App (2d) 160018, ¶ 31.

¶ 35 However, courts have found no "credibility contest" when one party's version of the events was either implausible or corroborated by other evidence. See, *e.g.*, *People v. Effinger*, 2016 IL App (3d) 140203, ¶¶ 12, 26 (circumstantial evidence supported victim's version of events and defense presented no evidence); *People v. Tademy*, 2015 IL App (3d) 120741, ¶¶ 19-20 (no "credibility contest" between experts where lay testimony corroborated one expert's testimony); *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (evidence not closely balanced where circumstantial evidence supported State's witnesses' testimony while defendant's entire version of events "strained credulity"); *People v. Anderson*, 407 Ill. App. 3d 662, 672 (2011) (evidence not closely balanced where defendant's version of events was implausible).

¶ 36 Here, while there were inconsistencies between A.F.'s testimony and her statements to Tawanda and Byrne, and while defendant denied the allegations, we are reminded that we must make a commonsense assessment of the evidence. *Sebby*, 2017 IL 119445, ¶ 53. There is nothing in the record to suggest that A.F. had a motivation to lie. Nor is there evidence to explain her knowledge of the sexual acts that she described. Common sense dictates that she

was being truthful and that the inconsistencies were due to her young age and the time that passed between the events and the trial. Unlike in *Sebby* and *Naylor*, there was also some corroboration of A.F.'s allegations. In particular, Tawanda testified that, when confronted, defendant looked at A.F. and said her name. Defendant also left the home without protest. This testimony was not specifically refuted. See *People v. Colon*, 2018 IL App (1st) 160120, ¶¶ 17-19.

¶ 37 Furthermore, defendant's testimony corroborated some of the allegations. For example, defendant admitted that he played "school" with the children, that he picked up A.F. at the bus stop after going to McDonald's, and that he told A.F. that she was beautiful. He also corroborated that he was home alone with A.F. during the time of some alleged events. Also, T.F. testified that defendant frequently called him to find out when he was going to be home. The recording of Byrne's interview with A.F., allowed into evidence in accordance with section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2014)), also corroborated some of the allegations. The purpose of section 115-10 is to allow corroborative statements of victims in child sexual abuse cases. *People v. Bowen*, 183 Ill. 2d 103, 115 (1998). In *Bowen*, our supreme court stated:

> "The probative value of corroborating complaints in these cases, especially in videotaped form, has been widely recognized. Children may be subject to memory loss in the often prolonged period between the abuse and trial, and videotaping the child's account of abuse at the earliest opportunity preserves the account while it still fresh in the child's memory; in addition, it allows for the examination of the conditions prevalent at the time of the child's initial complaint. [Citation.] A recording close in time to the first outcry, prior to any charges being filed, where feasible, also makes the statement less

likely to be the product of suggestion or even manipulation by overzealous prosecutors, parents, or caseworkers." *Id.* at 115-16.

As the court noted, "section 115-10 was a needed response to the difficulty of convicting persons accused of sexually assaulting children." *Id.* at 115.

¶ 38     The corroboration provided by A.F.'s section 115-10 statements, T.F.'s testimony, and defendant's reaction when confronted takes this case outside the realm of closely balanced evidence and distinguishes it from cases involving a lack of extrinsic corroborating evidence. Thus, while the evidence might not have been overwhelming, it was not closely balanced for purposes of plain error.

¶ 39     Defendant next contends that the State improperly shifted or lessened the burden of proof in closing argument, denying him a fair trial. He first argues that the State shifted the burden of proof when it suggested that there was no evidence that A.F. had a reason to lie or knew about sexual matters outside of defendant's conduct. Defendant concedes that he failed to object but contends that plain error applies. As previously discussed, the evidence was not closely balanced. Further, defendant was not deprived of a fair trial.

¶ 40     "It is well settled that prosecutors are afforded wide latitude in closing argument, and even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant." *People v. Burman*, 2013 IL App (2d) 110807, ¶ 25. "During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite response, and comment on the credibility of witnesses." *Id.* "In reviewing whether comments made during closing argument are proper, we must review the closing argument in its entirety and view remarks in context." *Id.*

¶ 41 " 'The defense is under no obligation to produce any evidence, and the prosecution cannot attempt to shift the burden of proof to the defense.' " *People v. Curry*, 2013 IL App (4th) 120724, ¶ 80 (quoting *People v. Beasley*, 384 Ill. App. 3d 1039, 1047-48 (2008)). "However, a prosecutor may respond to comments by defense counsel that clearly invite a response." *Id.*

¶ 42 Here, the defense placed A.F.'s credibility at issue. In opening statements and on cross-examination, the defense focused on inconsistencies in her statements. Thus, the State could fairly comment on A.F.'s credibility, including the lack of a motive for her to lie and the lack of evidence of her knowledge of sexual acts. Further, the State explicitly said that it had the burden to prove defendant guilty beyond a reasonable doubt. The court also properly instructed the jury that defendant must be proven guilty beyond a reasonable doubt and that arguments of counsel were not evidence. See *People v. Crowder*, 256 Ill. App. 3d 91, 100-01 (1993) (no prosecutorial misconduct when State commented on lack of motive for a witness to lie when State clearly stated its burden of proof and jury was properly instructed).

¶ 43 Defendant next argues that the State lessened the burden of proof by commenting that it welcomed the standard and that it was routinely used. Our supreme court has rejected such an argument, holding that a comment that the burden is not unreasonable and is met every day in courts was permissible. *People v. Bryant*, 94 Ill. 2d 514, 523-24 (1983). Accordingly, there was no error.

¶ 44                              III. CONCLUSION

¶ 45 The trial court did not plainly err when it failed to inquire whether the jurors understood the principles listed in Rule 431(b), and the State did not impermissibly shift or lessen the burden of proof during closing argument. Accordingly, the judgment of the circuit court of Kane County is affirmed. As part of our judgment, we grant the State's request that defendant be

assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 46     Affirmed.