2019 IL App (2d) 170845-U
No. 2-17-0845
Order filed December 17, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-1904 |
| RONALD SCOTTI, | ) ) ) | Honorable Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hudson and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court committed no plain error in admitting other-crimes evidence, as the evidence overall was not closely balanced.

¶ 2    Defendant, Ronald Scotti, appeals from the judgment of the circuit court of Kane County, challenging, as plain error, the admission of other-crimes evidence. Because the trial court did not commit plain error in admitting the other-crimes evidence, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4    Defendant was indicted on one count of aggravated battery based on bodily harm on or about a public way (720 ILCS 5/12-3.05(c) (West 2014)), one count of aggravated battery based

on insulting or provoking contact on or about a public way (720 ILCS 5/12-3.05(c) (West 2014)), one count of retail theft of merchandise valued under $300 (720 ILCS 5/16-25(a)(1) (West 2014)), one count of battery based on bodily harm (720 ILCS 5/12-3(a)(1) (West 2014)), and one count of battery based on insulting or provoking contact (720 ILCS 5/12-3(a)(2) (West 2014)).[1] Defendant opted for a jury trial.

¶ 5    Before trial, the State moved *in limine* to admit evidence that defendant committed two retail thefts in 2015, one retail theft in 2014, and one retail theft in 2010. The State sought to have the other-crimes evidence admitted to prove defendant's intent and absence of mistake. The trial court denied the State's motion to admit the other-crimes evidence during its case in chief. However, the court stated that, should defendant testify and open the door to the admission of such evidence, it would allow the State to present it for the purpose of showing absence of mistake or *modus operandi*.

¶ 6    The following facts were established at trial. On November 20, 2015, Jordan Anderson was working as a loss-prevention agent at a Carson Pirie Scott department store in Aurora. Also working that day was his supervisor, Allison Anderson.

¶ 7    At about 4 p.m., Jordan and Allison were in an office monitoring various surveillance cameras located around the store. In doing so, they saw defendant, whom they recognized, enter the store. After seeing defendant enter, Jordan and Allison went to the fragrance section of the store. As Jordan stood 20 feet from defendant, he saw defendant pick up two boxed sets of

---

[1] Before trial, the State amended the aggravated-battery counts to state that the offenses occurred in a place of public accommodation (720 ILCS 5/12-3.05(c) (West 2014)) and dismissed the two simple-battery counts.

fragrance. Jordan saw defendant walk about 15 feet to the adjacent home-goods department. Defendant then placed both boxes under his shirt. Defendant then took the escalator to the lower level of the two-level store.

¶ 8    Allison, who had also observed defendant hide the boxes, followed him, while Jordan exited the store. Allison radioed Jordan and told him to stop defendant once defendant passed the last point of sale.

¶ 9    After going outside, Jordan saw defendant exit the store with Allison following. Jordan observed the shape of the fragrance boxes under defendant's shirt.

¶ 10    At that point, Jordan approached defendant and identified himself as a loss-prevention agent. He told defendant that he needed to talk with him about the items under his clothes. He then asked defendant to accompany him back inside the store, which defendant did. Jordan described defendant as cooperative.

¶ 11    As Jordan led defendant into the store, Allison followed defendant. As she did, she accidently stepped on one of defendant's shoes. Defendant became very angry. Allison then took the lead, and Jordan followed defendant. Jordan then accidently stepped on one of defendant's shoes, at which point defendant became angrier and started cussing. According to Allison, the reason that they accidently stepped on defendant's shoes was that he kept slowing down and speeding up as he walked toward the store.

¶ 12    Once in the store, they escorted defendant toward the escalator. Because defendant was yelling and cursing, Jordan attempted to handcuff him. When he did so, defendant swung at Allison, striking her eyeglasses. Defendant also swung at Jordan. After that, Jordan took defendant to the floor. Defendant physically resisted by kicking, punching, and spitting.

¶ 13    According to Jordan, as he took defendant to the floor, defendant scratched Jordan's face. Photographs taken shortly after the incident showed a scratch on Jordan's face. Jordan denied having a scratch on his face before the altercation.

¶ 14    Once on the floor, defendant continued to resist. According to Jordan, defendant twisted Jordan's ankle. On cross-examination, Jordan admitted that there were no surveillance cameras in the area where the altercation occurred.

¶ 15    According to Allison, she was the loss-prevention supervisor on the day of the incident. While she and Jordan were monitoring surveillance cameras, she saw defendant enter the store.

¶ 16    She and Jordan then went to the fragrance area. As she watched him, defendant picked up two fragrance box sets, walked to the nearby home-goods department, and concealed both boxes under his shirt.

¶ 17    After doing so, defendant took the escalator to the lower level and "[made] a beeline right for the door." According to Allison, after he passed the last point of sale, defendant exited the store. She maintained sight of defendant as she followed him out the door.

¶ 18    She then saw Jordan stop defendant. At that time, defendant's demeanor was perfectly fine. Allison identified herself as the loss-prevention supervisor and followed defendant and Jordan into the store. As they walked into the store, Allison accidently stepped on the back of one of defendant's shoes. After doing so, she exchanged positions with Jordan.

¶ 19    According to Allison, after she stepped on defendant's shoe, he became agitated and aggressive, calling her and Jordan names. As they approached the escalator, defendant insisted that they call the police. At that point, defendant swung at Jordan. Defendant also swung at her, striking her glasses.

¶ 20    After defendant swung at them, they attempted to take him to the floor.  As they did so, defendant tried to kick, bite, and get free from them.  They eventually got him to the floor and handcuffed him.  According to Allison, before the incident, Jordan did not have a scratch on his face, but he did thereafter.

¶ 21    Allison requested that a receipt be generated showing the value of the two boxes.  The receipt, admitted into evidence, showed a total value of $165.  She identified two boxes as those taken by defendant.

¶ 22    On cross-examination, Allison admitted that there were no surveillance cameras that recorded defendant taking the fragrance boxes or the altercation.

¶ 23    Officer Jenny Rizo of the Aurora Police Department was on patrol the day of the incident.  She was assigned to investigate the incident, described as involving a retail-theft suspect who was reportedly fighting with two loss-prevention officers.

¶ 24    After entering the store, Officer Rizo saw two loss-prevention officers standing up and defendant lying face down on the floor.  Defendant was handcuffed.  She described defendant as very hostile and agitated.  As she and another police officer stood defendant up, she saw a box-shaped object under his clothing and another box nearby.  When she removed the box from under defendant's clothes, she saw that it contained men's fragrance.  Officer Rizo identified the two boxes of fragrance taken from defendant.  After defendant was transported to the police station, he remained very agitated, volatile, and hostile.

¶ 25    At one point, Officer Rizo inventoried defendant's belongings.  He had a wallet that contained only an Illinois identification card, a gift card, and 92 cents.

¶ 26    Defendant testified that he rode his 10-speed bike to the store to return two fragrance boxes. According to defendant, he had receipts for the boxes in his wallet. Because he needed both hands to operate the bike safely, he placed the two boxes under his shirt.

¶ 27    When he arrived at the store, he parked his bike outside and entered the men's department. The boxes remained under his shirt after he entered the store.

¶ 28    According to defendant, as he walked toward the bottom of the escalator, he was approached by the two loss-prevention officers. Jordan grabbed him by his left arm, and Allison by his right. They told him that he was coming with them. The officers tried to put his arms behind his back.

¶ 29    They then walked defendant out of the store. As they did, they kicked him twice in his previously broken leg. According to defendant, in early October of that year, his leg was broken in 17 places when he was struck by a truck while riding his bike. He was still in pain from his broken leg.

¶ 30    Once outside, the officers made defendant walk up some stairs and had him stand for about 10 minutes before telling him that they were loss-prevention officers. They then brought him back inside the store. Defendant denied provoking the officers.

¶ 31    According to defendant, Jordan slammed him to the floor. After doing so, Jordan punched him in the mouth eight times. After Jordan scratched himself, he stood up and told defendant that he was going to charge him with aggravated battery. When defendant asked Jordan how he was going to prove that, Jordan "stomped [his] face 16 times with his foot." Defendant claimed that a surveillance camera recorded the incident.

¶ 32    Defendant admitted to resisting being handcuffed by lying with his arms under his chest. As Jordan tried to free his hands, Allison was kneeling on his previously broken leg, causing him pain. Defendant denied twisting Jordan's ankle.

¶ 33    At some point, defendant voluntarily gave them access to his hands. However, he was not handcuffed until the police did so outside the store.

¶ 34    On cross-examination, defendant admitted that there was no cast on his leg and that he rode his bike about three miles to the store. Although he was upset because the officers kicked his leg, he denied yelling or taking a swing at Allison.

¶ 35    After defendant testified, the State asked the trial court to admit evidence of defendant's prior retail thefts. The court admitted the 2014 and 2015 retail thefts for the "sole purpose of absence of mistake or accident." Defendant asked the court to reconsider, because he had not argued that he had made a mistake. In rejecting defendant's argument, the court stated that the retail thefts were admissible because defendant claimed that the loss-prevention officers had mistakenly believed that defendant had stolen the boxes.

¶ 36    The State then presented rebuttal evidence of the three retail thefts, two of which had occurred at the same store as the one in this case. Officer Rizo testified that she did not observe any injuries on defendant when she arrested him.

¶ 37    The trial court instructed the jury that it was to consider the prior retail thefts only for the limited purpose of defendant's absence of mistake or accident. The jury found defendant guilty of aggravated battery based on insulting or provoking contact and of retail theft and not guilty of aggravated battery based on bodily harm.

¶ 38    Defendant filed a motion for a new trial, but he did not challenge the admission of the other-crimes evidence. Following the denial of the posttrial motion, the trial court sentenced

defendant to concurrent terms of five years' imprisonment for aggravated battery and three years' imprisonment for retail theft. Following the denial of his motion to reconsider the sentence, defendant filed this timely appeal.

¶ 39                                    II. ANALYSIS

¶ 40    Defendant admits that he forfeited the other-crimes issue by not raising it in his posttrial motion, but contends that the admission of the other-crimes evidence was plain error, because it was not properly admitted to prove intent or absence of mistake and the evidence overall was closely balanced.

¶ 41    We agree that defendant forfeited the other-crimes issue by failing to include it in his posttrial motion. See *People v. Reese*, 2017 IL 120011, ¶ 68. However, we may consider a forfeited issue when either (1) the evidence is closely balanced, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Under the first prong of the plain-error test, a defendant must show that the evidence was so closely balanced that the error threatened to tip the scales of justice against the defendant. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 42    Generally, a court of review applying the plain-error rule first decides whether there was an error. *People v. Rinehart*, 2012 IL 111719, ¶ 15. However, where the only basis urged for plain error is that the evidence was closely balanced, and it is clear that the alleged error would not have affected the outcome of the trial, a reviewing court need not engage in the meaningless endeavor of determining whether an error occurred. *People v. White*, 2011 IL 109689, ¶ 148.

¶ 43    In determining whether the evidence was closely balanced, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53. The inquiry involves an assessment

of the evidence as to the elements of the offense, along with any evidence regarding the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 44 Where witnesses for the State and the defendant give plausible versions of the events, neither of which is corroborated by extrinsic evidence, the evidence is closely balanced. *People v. Olla*, 2018 IL App (2d) 160118, ¶ 34. Put another way, when the outcome depends on a choice between two credible versions, the evidence is closely balanced. *Olla*, 2018 IL App (2d) 160118, ¶ 34.

¶ 45 However, courts have found no credibility contest when one party's version of the events either was corroborated by other evidence or was implausible. *Olla*, 2018 IL App (2d) 160118, ¶ 35. For example, the evidence was not closely balanced where the circumstantial evidence supported the State's witnesses and the defendant's version strained credulity. *Olla*, 2018 IL App (2d) 160118, ¶ 35; see also *People v. Hernandez-Valdez*, 260 Ill. App. 3d 644, 647 (1994) (evidence not closely balanced where State's witnesses were highly credible and the defendant's testimony was unbelievable).

¶ 46 In this case, we begin with the evidence related to the retail theft. Both Jordan and Allison testified that they saw defendant conceal two boxes of fragrance under his clothing. When Officer Rizo arrived on the scene, she found one box still under defendant's shirt and the second on the floor near defendant. Further, when Officer Rizo inspected the contents of defendant's wallet, she found no receipts. The physical presence of the boxes on and near defendant, and the absence of any receipts, corroborated the State's witnesses.

¶ 47 Defendant's explanation, on the other hand, was that he was merely returning the boxes. According to him, he had placed the boxes under his shirt so that his hands would be free to operate his bicycle. However, once defendant arrived at the store, he parked his bike and walked in. Even

though his hands were then free, he continued to keep the boxes concealed under his clothing. That was inconsistent with his purported explanation of why the boxes were found under his shirt. Defendant also claimed that he had receipts for the boxes in his wallet. However, when Officer Rizo inspected his wallet, the only items she found inside were an identification card, a gift card, and 92 cents. Thus, because defendant's version was internally inconsistent, and belied by the lack of any receipts in his possession, his explanation that he was merely returning the boxes was unbelievable.

¶ 48    When we consider the credibility of the State's witnesses and the unbelievable testimony of defendant regarding the theft of the boxes, we conclude that the evidence was not closely balanced. Thus, as to the retail theft, there was no plain error in admitting the other-crimes evidence.

¶ 49    We next address the evidence related to the aggravated battery. Jordan testified that, when he took defendant to the floor, defendant was kicking, punching, and spitting. According to Jordan, defendant scratched him during the altercation. Also, both Jordan and Allison testified that Jordan did not have a scratch on his face before the incident. Their testimony was corroborated by the photos, which showed that Jordan's face had been scratched. In his reply brief, defendant admits that the photos showed a scratch on Jordan's face, but he characterizes it as extremely minor. However, even a minor scratch corroborates the testimony that defendant scratched Jordan.

¶ 50    Defendant did not deny that there was a physical struggle between himself and the officers. However, he testified that he did not provoke the altercation and that Jordan was actually the aggressor. To that end, he testified that Jordan punched him in the mouth 8 times and stomped on his face 16 times. Yet there was no physical evidence that his face was injured. Indeed, Officer Rizo testified that when she arrested defendant she did not observe any physical injuries. Also,

although defendant testified that the officers provoked him by kicking him in his broken leg, the physical evidence was inconsistent with that testimony. Even though he claimed that his leg had been fractured in 17 places only six weeks earlier, his leg was not in a cast. Further, his claim that he had a severely broken and painful leg was belied by the fact that he rode his bicycle nearly three miles to the store. Defendant's testimony that Jordan was the aggressor was simply unbelievable.

¶ 51    When we consider the credible evidence from the State's witnesses and defendant's incredible version of the incident, we conclude that the evidence was not closely balanced as to whether defendant battered Jordan. Thus, as to the aggravated-battery offense, there was no plain error in admitting the other-crimes evidence.

¶ 52    Because we conclude that the evidence was not closely balanced, there was no plain error. Thus, we need not decide whether the court erred in admitting the other-crimes evidence.

¶ 53                                III. CONCLUSION

¶ 54    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 55    Affirmed.