2022 IL App (2d) 180151-U  B
No. 2-18-0151
Order filed  June 1, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Stephenson County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos.    16-CF-283 |
| | ) |            16-CM-1034 |
| | ) | |
| TWIQWON R. FANE, | ) | Honorable |
| | ) | Val Gunnarsson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Evidence was not closely balanced for purpose of establishing plain error.

¶ 2                                I. INTRODUCTION

¶ 3    Following a jury trial in the circuit court of Stephenson County, defendant, Twiqwon R. Fane, was convicted of home invasion, burglary, attempted robbery, and aggravated battery.  He was sentenced to 30 years' imprisonment for home invasion and several lesser sentences for the other offenses, which were to run concurrently.  Defendant previously appealed, raising two alleged errors.  First, he asserted that the trial court should not have given the jury an accomplice-

witness instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.17)) regarding a witness who gave exculpatory testimony for the defense. Second, he argued that the trial court did not properly question the jury in accordance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) (the State agreed with the latter contention but argued that it was not properly preserved and did not constitute plain error). We reversed based on the first issue and did not address the second issue as it was not likely to recur on remand. See *People v. Fane*, 2020 IL App (2d) 180151, ¶ 1 (*Fane I*). The State sought review in the supreme court, and the supreme court reversed our decision. *People v. Fane*, 2021 IL 126715, ¶ 1. The supreme court also remanded this case to us with the instruction that we consider the issue that we did not decide in our earlier disposition. We now do so and affirm.

¶ 4                                    II. BACKGROUND

¶ 5      Defendant was convicted of a number of offenses stemming from a home invasion that occurred on November 18, 2016. The victim, Voncile Modlinger, testified that her home had also been broken into six days earlier. McGee pleaded guilty to home invasion and residential burglary in connection with the incident at issue, and he was sentenced to 10 years' imprisonment. The following testimony was presented at defendant's trial.

¶ 6      The State first called Timothy Weichel, a sergeant with the Freeport Police Department. He testified that he was dispatched to a residence on East Pershing Street in Freeport at about 2:23 a.m. on November 18, 2016, regarding an "open 911 call." An "open 911 call" is a call where someone dialed 911 but no one then spoke, though one could still hear "some type of interaction going on on the phone." Dispatch related that a home invasion was in progress. Weichel parked near the residence and approached on foot. He could hear a female screaming inside. He approached the door and looked through a window. Weichel observed a black man with a long

goatee. Weichel pointed his firearm at the man, and the man fled, leaving the residence. Weichel later identified the man as McGee. Weichel believed that there was another subject in the house, as the female was still screaming as if she was being attacked. Weichel entered the residence and found the female, Modlinger, who informed him that both subjects had fled.

¶ 7    Weichel testified that he then started to search for the two subjects. He "could hear leaves crumbling as if somebody was walking through them." He could also hear "dogs aggressively barking" in the area, so he searched in that direction. He believed that the subjects were traveling northeast, and he radioed that to incoming units. About five minutes later, Corporal Ben Johnson radioed that he saw two individuals running through a field near the Provena St. Joseph Center. Weichel proceeded to Provena, where he observed that Johnson had two subjects "proned out" on the ground. He recognized McGee as the man he had observed inside the residence on East Pershing Street. A show-up identification was completed with Modlinger, and the subjects were transported to the police station. Subsequently, Weichel located a white T-shirt near where defendant was taken into custody. The shirt was collected as evidence by Officer James Hodges. McGee did not wear a mask during the home invasion. Weichel identified defendant as the other individual taken into custody at Provena.

¶ 8    On cross-examination, Weichel acknowledged that he moved the white T-shirt before it was photographed. He explained that he did this so he "could continue to look through the debris and other stuff." The shirt was photographed when Hodges collected it.

¶ 9    The State next called Corporal Johnson. At about 2:30 a.m. on November 18, 2016, he received a dispatch about the incident taking place on East Pershing Street. He traveled to a location that he selected based upon what he had heard from Weichel regarding the direction in which the subjects were fleeing. He exited his squad car and heard dogs barking. He then observed

two individuals sprinting across a field west of Provena. He radioed this in. They did not see him, and he ran to catch up to them. Johnson entered the parking lot at Provena and saw the two subjects crouching down by a parked truck. Johnson added that it looked as if they were trying to conceal themselves. As he approached, the two subjects saw him and ran. He pursued. The subjects ran into an area that led to an entrance into Provena but was otherwise a dead end. One subject was standing in the open, and the other was attempting to hide. Johnson drew his Taser. He ordered both subjects to the ground, and they complied. Another officer arrived, and the subjects were handcuffed. Johnson identified body camera footage that showed a white object in defendant's possession. On cross-examination, Johnson agreed that defendant was cooperative.

¶ 10    Officer Hodges was the State's next witness. At approximately 2:22 a.m. on November 18, 2016, Hodges responded to the area of East Pershing Street in Freeport. Weichel had advised that there were subjects running from the area, heading northeast. Hodges observed two individuals running in the area of Provena. After Johnson secured the individuals, Hodges transported defendant to the police department. Defendant told Hodges that he needed Hodges to "call his people," whom he identified as Lizzy and Gabby. He stated that Gabby was his girlfriend. Defendant stated that Gabby's car had been stolen that night. Subsequently, Hodges returned to Provena, where he photographed a white T-shirt and took it into evidence.

¶ 11    On cross-examination, Hodges acknowledged that he did not turn on his squad car's recording device while he was transporting defendant to the police station. He could not remember whether he had activated his body camera.

¶ 12    The next witness for the State was Alan Guilfoyle, a 911 dispatcher for the Freeport Police Department. At about 2:20 a.m. on November 18, 2016, Guilfoyle received a call regarding a home

invasion of a residence on East Pershing Street. He identified a recording of that call. The caller seemed frightened and excited.

¶ 13    The victim, Voncile Modlinger, next testified. She stated that she had been living at the residence on East Pershing Street for over 50 years. In November 2016, the residence was broken into twice. The first break-in occurred on November 12, 2016. During the first break-in, the intruder took money and her phone. She bought a new phone and kept it in bed beside her.

¶ 14    On November 18, 2016, in the middle of the night, she heard a noise and called 911. She stated that someone had broken into her house and that she gave the location. This is all she had time to say before one of the intruders arrived at the foot of her bed. His face was covered with something white. He threw a plastic laundry basket at her face. A second man walked in behind the first intruder. She recognized the second individual. The second man said, "This is my cousin," and then "Now don't you hurt her." They ordered Modlinger out of bed. One of the men looked under the mattress. He then grabbed her and pushed her around the bed and into the hall. She saw the other man in her living room, recognizing him, as he had been there before. The first man lifted Modlinger up and down. He threw her, and she was not sure what happened next. Eventually, the police arrived.

¶ 15    On cross-examination, Modlinger agreed that she never heard the two intruders refer to each other as "cuz" or "bro." They did not speak to each other much during the incident.

¶ 16    The State's next witness was Gabrielle Gill. On November 18, 2016, defendant had been her boyfriend, but they were no longer together. On the night of November 17, 2016, she spent the night at defendant's house. When she lay down for the evening, her car was there. Someone had asked if they could use it, and she said yes. When she awoke, her car was gone. She clarified that she had given permission to someone to use the car. When she went to bed between 9:30 and 10

p.m., she was not sure whether defendant was present in the house. She added that she gave defendant's cousin permission to use the car, but not defendant. Further, she agreed that she spoke with Freeport police officer Daniel Moore at about 4 a.m. on November 18, 2016, and told him that defendant had permission to use her car. She explained that this was on the condition that he had someone to drive him. Gill testified that she knew McGee. McGee was defendant's cousin. She identified a set of car keys (State's exhibit 6) as having been hers on November 18, 2016.

¶ 17    On cross-examination, Gill stated that there was a lot of stuff in the car on November 18, 2016. She explained that both she and defendant were moving. This included a bag of clothes.

¶ 18    The State then called Moore. He testified that he was on duty on November 18, 2016, at approximately 2:30 a.m. He was dispatched to a residence on East Pershing Street, where he spoke to Modlinger. He observed a set of car keys on the living room floor. Modlinger stated that they were not hers, and Moore took possession of them. He located a vehicle parked nearby that the keys operated. He subsequently gave them to Hodges to hold as evidence. Moore identified State's exhibit 6 as the keys he recovered.

¶ 19    Detective Tim Krieger testified that he obtained DNA samples from defendant and McGee. He also obtained a sample from the white T-shirt. Heather May, a forensic scientist, analyzed the samples and determined that neither McGee nor defendant could be excluded from the mixture of DNA samples recovered from the shirt. She further testified that "approximately one in 4.1 million black" individuals could not be excluded from the sample. The State also called several witnesses to testify to the chain of custody of various items of evidence.

¶ 20    The State then rested. Defendant first recalled Guilfoyle. He testified that he did not recall either of the subjects saying that the other was his cousin. during the 911 call. He did, however, hear the subjects call each other "bro" or "cuz" on multiple occasions.

¶ 21    Defendant also called McGee. McGee testified that he was in the custody of the Illinois Department of Corrections as a result of the break-in on East Pershing Street on November 18, 2016. McGee pleaded guilty to home invasion and residential burglary.

¶ 22    McGee testified that on November 17, 2016, he was at his cousin's house on Elk Street. About eight people were present, including defendant, Gill, Liz, Brittany, and James Beales (McGee identified some of those present only by first name). At one point, McGee, defendant, Brittany, and Beales left in Gill's car to go to Logan's (apparently, a tavern). Brittany drove, as she was the only one with a driver's license. They left Logan's together. Brittany subsequently left, and Beales started driving. Defendant got into the front passenger seat. About 30 minutes later, they dropped defendant off near the corner of Rotzler Avenue and Galena Avenue. When defendant left, McGee got in the front passenger seat. Beales and McGee drove around for about 20 minutes and smoked two "blunts." They were "scheming" the home invasion.

¶ 23    They eventually went to Modlinger's house. When asked why they selected Modlinger's house, McGee said he was "just following" Beales. Both men had taken white T-shirts from Gill's car. Beales covered his face. They made contact with Modlinger, and Beales dragged her out of bed. McGee was looking for money. After 10 to 15 minutes, he heard something at the front door and pulled the curtains back. A police officer shined a light into the house at McGee. McGee ran out the other door, saying, "Come on, Cuz" twice to Beales on the way out. McGee testified that he ran across the street and Beales ran up the street. McGee had not put a T-shirt over his face, because the house was dark and he described himself as "black, black". However, he kept the shirt with him.

¶ 24    McGee heard dogs barking. He ran to Provena. As he approached Provena, he noted two police cars in the area, so he crouched down. He saw an individual wearing a black hoody. The

individual turned around, and it was defendant. McGee heard someone say "stop" and "get on the ground." He ran and told defendant, "Come on." They ran into a dead end and were cornered. McGee threw his T-shirt to defendant.

¶ 25    McGee testified that he was not a blood relative of defendant, but he was of defendant's half-sister. He was a blood relative of Beales.

¶ 26    On cross-examination, McGee acknowledged that he referred to defendant as his cousin. McGee stated that it was his accomplice's idea to target Modlinger's house. McGee denied ever having been there before. After the police officer came to the front door of Modlinger's house, McGee fled, running across a street, through a backyard, through "a woods," past a youth home (Sleezer Home), and to Provena. McGee stated he was alone until he got to Provena. He ran into defendant at Provena. McGee clarified that, though he said that he had run through "woods," it was more of a field. When McGee encountered defendant by Provena, he told defendant that he was "creeping" around because there were two police cars nearby. According to McGee, defendant then stated that he was selling "weed" and that he felt that he was being set up. McGee clarified that defendant was about to meet someone for a drug deal. McGee was about to tell defendant what he and Beales had done when the police arrived. McGee explained that he threw the white T-shirt to defendant just before the police apprehended them, because defendant was closer to the building and he thought that defendant could throw it on the roof.

¶ 27    McGee testified that he and defendant had been friends for 15 to 17 years, though they had had "[a] couple fights." When asked whether he considered defendant a close friend, McGee stated that defendant was "[a] 50/50 friend." When McGee observed defendant at his cousin's house on Elk Street, he did not recall seeing burs on defendant's clothing. On redirect examination, McGee explained that he referred to many people as "cuz" or "bro."

¶ 28    Defendant rested and the State called Hodges in rebuttal. Hodges testified that he collected a black hooded sweatshirt from defendant on the night of November 18, 2016. The sweatshirt was admitted into evidence. The shirt had "cockleburs or prickly things" on the front of it.

¶ 29    The jury found defendant guilty of home invasion (count II), residential burglary (count III), conspiracy to commit residential burglary (count IV), attempted robbery (count V), aggravated battery (victim over 60 years of age) (count VI), and aggravated battery (while masked) (count VII).

¶ 30                                    III. ANALYISIS

¶ 31    The remaining issue in this case upon remand concerns *voir dire*.  Defendant contends that the trial court did not conduct *voir dire* in accordance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).  This rule requires a trial court to ask all potential jurors whether they understand and accept each of four principles: "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." *Id*.  The failure to inquire regarding any one of these principles constitutes noncompliance with this rule.  See *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 32    Defendant points out that the trial court neglected to question one panel of four potential jurors whether they understood and accepted the principles set forth in Rule 431(b).  One of these individuals was seated on the jury.  The State concedes that this was error; however, it points out that defendant did not object to this omission.  The State further argues that this error does not rise to the level of plain error.

¶ 33     Plain error arises in two forms; it occurs either when "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Heron*, 215 Ill. 2d 167, 187 (2005).  Here, defendant focuses on the first prong of the analysis, which is commonly referred to as the closely-balanced prong.  To succeed, defendant must show "that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Id*.  Parenthetically, we note that violations of Rule 431(b) are generally not amenable to plain-error analysis under the second prong of the test. *Thompson*, 238 Ill. 2d at 614-15.

¶ 34     Defendant argues that the outcome of his trial turned on a credibility contest between McGee and the State's witnesses.  Defendant points to *People v. Naylor,* 229 Ill. 2d 584, 608 (2008), where the supreme court stated: "Of course this evidence was closely balanced.  The evidence boiled down to the testimony of the two police officers against that of defendant."  We note, however, that the *Naylor* court also stated, "[A]t the close of the testimony in this case, the trial court was faced with two different versions of events, both of which were credible." *Id*.  As we explain below, this is not the case here.

¶ 35     Defendant contends that had the jury believed McGee, it would have acquitted him.  According to defendant, McGee's testimony explained why defendant was in the area and why he would have run from the police (defendant's alleged drug deal).  Moreover, defendant points out, the white T-shirt recovered where defendant was arrested contained DNA samples from which neither he nor McGee could be excluded.  Defendant also points out that if he used the T-shirt during the home invasion and retained it until just before he was arrested, McGee's DNA should not have been on the shirt.

¶ 36    The State counters that the evidence was not closely balanced. It notes that, "[i]n determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. The State further observes that evidence is not closely balanced where "one party's version of events was either implausible or corroborated by other evidence." *People v. Olla*, 2018 IL App (2d) 160118, ¶ 35. The State contends both conditions are present here.

¶ 37    The State first notes that it is undisputed that McGee entered the victim's house with another man who was wearing a white mask. McGee referred to the man as "cuz." At trial, McGee testified that he referred to defendant as "cuz" or "bro." Gill testified that she knew McGee and defendant to be cousins. Weichel testified that two men fled from the victim's home. Johnson testified that he observed two individuals sprint across a field behind Provena and crouch down near a truck. He apprehended them; it was defendant and McGee. Footage from Johnson's body camera shows a white object in defendant's possession. Defendant and McGee were apprehended about four blocks from the victim's home and about five minutes after the two individuals fled from her home. The keys from defendant's girlfriend's vehicle were found in the victim's home, and it was parked nearby. As Hodges transported defendant to the police station, defendant stated that his girlfriend's car had been stolen. McGee testified that Beales fled down the street; however, despite the police presence in the area, he was not apprehended.

¶ 38    McGee testified that he happened to run into defendant just before the two men were apprehended. Defendant happened to be preparing to engage in a drug transaction in the exact location to which McGee fled. Just prior to being caught, McGee—who had not used a mask during the home invasion—threw a white T-shirt to defendant. Moreover, Johnson had observed

two men running across an area variously described as a field or a woods. The hooded sweatshirt defendant was wearing when he was apprehended had cockleburs on it.

¶ 39　The defense's version is implausible. First, there is the coincidental meeting between defendant and McGee moments before the two were apprehended by the police. Defendant's version requires that defendant set up a drug transaction in the very location McGee fled to after the home invasion. Further, the two were caught a mere five minutes after and four blocks away from the site of the home invasion. Defendant's girlfriend's vehicle was found in the area of the home invasion, and her keys were found in the victim's home. Defendant manifested consciousness of guilt by telling Hodges that the vehicle had been stolen while defendant was being transported to the police station. Notably, defendant had been in the vehicle not long before the home invasion, as McGee testified that they had dropped defendant off about 30 minutes after they left Logan's. Thus, the last thing defendant would have known based on McGee's version of events was that the vehicle was in the possession of McGee and Beales. There is no plausible reason that he would have thought the vehicle had actually been stolen in the short time between when he was allegedly dropped off and then reunited with McGee. Clearly, defendant was trying to provide an innocent explanation for the vehicle's presence near the scene of the home invasion. McGee testified that he did not have a chance to tell defendant about the home invasion after they met at Provena, so, on McGee's version, defendant would have no reason to claim Gill's car was stolen as he would not have known about the home invasion. Additionally, the cockleburs on defendant's sweatshirt provide confirmation that he was one of the men Johnson observed running across the field. He simply would not have picked up such burs walking down a sidewalk or standing around in a parking lot. Also, accepting McGee's version would require one to believe

that he carried around a T-shirt during the home invasion and while fleeing despite the fact that he did not use it during the crime and did not feel he needed to cover his face.

¶ 40    Given the implausibility of McGee's version of events, we cannot say that this case involved a credibility contest between McGee and the State's witnesses. *Naylor,* 229 Ill. 2d at 608, which defendant cites, begins with the proposition that the trier of fact was presented with two plausible version of events—one from the State and one from the defense. Such is not the case here. As defendant's version strained credulity, the evidence was not closely balanced. See *People v. Lopez*, 2012 IL App (1st) 101395, ¶ *Id.* 88-89.

¶ 41    Before closing, we must comment on our finding in *Fane I*, 2020 IL App (2d) 180151, ¶ 40, that the State had failed to establish that the error at issue in that case was not prejudicial because "McGee's testimony represented defendant's entire defense, and resolution of this case turned on the relative credibility of McGee and the State's witnesses." That is, it was the State's burden to show that the error was harmless beyond a reasonable doubt. *People v. French*, 2020 IL App (3d) 170220, ¶ 28. Conversely, here, it is defendant's burden to establish that the evidence was closely balanced. *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007). These are very different standards, as our supreme court explained in *People v. Thurow*, 203 Ill. 2d 352, 363 (2003):

> "Though plain-error analysis normally requires the same kind of inquiry as does harmless-error review, there is an 'important difference' between the two. [Citation.] In a harmless-error analysis, which applies where, as in the case at bar, the defendant has made a timely objection, it is the State that 'bears the burden of persuasion with respect to prejudice.' [Citation.] In other words, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error. [Citations.] The situation is different under a plain-error analysis, which applies where the defendant has failed to

make a timely objection. There, '[i]t is the defendant rather than the [State] who bears the burden of persuasion with respect to prejudice.' [Citation.] 'In most cases, a court of appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial.' [Citation.]"

¶ 42     As a corollary, "[t]o preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Sebby,* 2017 IL 119445, ¶ 48. Defendant admits that no objection was made in regard to the alleged error occurring during *voir dire.*

¶ 43     Hence, there is nothing inconsistent with our earlier finding that the State failed to prove beyond a reasonable doubt that the outcome of the proceeding would have been different and our finding here that defendant has not established that the evidence is closely balanced. *Cf. People v. Holt*, 2019 IL App (3d) 160504-B, ¶ 42 ("While we have already determined that the evidence was sufficient for a reasonable trier of fact to find beyond a reasonable doubt that Holt committed retail theft, it is imperative to recognize that the question of whether evidence is sufficient under a reasonable doubt challenge is different from the question of whether evidence is closely balanced under plain-error review.").

¶ 44     Accordingly, we hold defendant has not established that plain error occurred in this case.

¶ 45                                    IV. CONCLUSION

¶ 46     In light of the foregoing, the judgment of the circuit court of Stephenson County is affirmed.

¶ 47     Affirmed.