NOTICE
Decision filed 11/14/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200221

NO. 5-20-0221

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 19-CF-137 |
| | ) | |
| JOSHUA D. ROWLANDS, | ) | Honorable |
| | ) | Allan F. Lolie, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Welch and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1     The defendant, Joshua D. Rowlands, was convicted, following a trial by jury in the circuit court of Effingham County, of one count of aggravated criminal sexual abuse and one count of predatory criminal sexual assault of a child. 720 ILCS 5/11-1.60(c)(1)(i), 11-1.40(a)(1) (West 2018). He was thereafter sentenced to a total of 13 years of imprisonment in the Illinois Department of Corrections (IDOC), to be followed by a term of mandatory supervised release (MSR). In this direct appeal, he contends the State did not prove him guilty beyond a reasonable doubt and that the trial judge erred in his admonishments to the potential jurors. For the reasons that follow, we affirm.

1

¶ 2                    I. BACKGROUND

¶ 3    On March 28, 2019, the defendant was charged, by information, with one count of aggravated criminal sexual abuse. The information alleged that between March 8 and March 10, 2019, the defendant "knowingly committed an act of sexual conduct with B.H., who was under 13 years of age when the act was committed, in that the defendant knowingly touched the breast of B.H. with his hand for the purpose of sexual arousal of the defendant." On April 17, 2019, the defendant was charged, by indictment, with the same offense. On January 24, 2020, the defendant was charged, by information, with one count of predatory criminal sexual assault of a child. The information alleged that between March 8 and March 10, 2019, the defendant "knowingly committed an act of sexual contact with B.H., who was under 13 years of age when the act was committed, in that the [d]efendant touched the vagina of B.H. with his finger for the purpose of sexual arousal of the defendant." On February 19, 2020, the defendant was charged, by indictment, with the same offense.

¶ 4    The case proceeded to a trial by jury on both counts. Jury selection was conducted on February 24, 2020, during which the trial judge read to the potential jurors the four principles of law required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), which are known commonly as the *Zehr* principles.[1] The trial judge asked each potential juror if that juror heard the four principles, agreed with them, and accepted them to be true. Each potential juror answered affirmatively. The trial judge did not ask any of the potential jurors if they understood the four principles.

_____

[1]The four principles are that a defendant (1) is presumed innocent of the charge(s) against him or her, (2) is not required to offer any evidence on his or her own behalf, (3) must be proved guilty beyond a reasonable doubt, and (4) may not have his or her failure to testify held against him or her. See *People v. Zehr*, 103 Ill. 2d 472, 477 (1984).

¶ 5    Testimony in the trial began on February 27, 2020. The first witness to testify for the State was B.H. She testified that at the time of trial she was 12 years old and that she was born on March 15, 2007. She testified that in March 2019, prior to her birthday, she went to a sleepover at the home of her friend, Kyleigh. She testified that Kyleigh's stepfather is the defendant. B.H. testified that while she was sleeping at Kyleigh's home, the defendant lay down beside her and began to touch her. She testified that the defendant first rubbed her stomach, then moved his hand to her chest, then down to "in [her] pants." B.H. was asked where "in particular" the defendant touched her under her pants. When B.H. did not respond, counsel for the State added, "Do you know, [B.H.], or can you elaborate? [B.H.], could you answer the question? Besides your breast and your stomach, where else did he touch you at? However—whatever you want to say, say it." When B.H. still did not respond, counsel asked to withdraw his question and continued with other, more general, questions about the sleepover, which adduced testimony from B.H. that she and Kyleigh were sleeping together on a hide-a-bed on the Saturday morning that the touching occurred.

¶ 6    Thereafter, counsel for the State asked B.H., "after he touched your breasts, did he touch any other parts of your body?" B.H. answered, "Yes." When asked to elaborate, B.H. did not respond, and counsel again asked to withdraw his question. The trial judge responded, "Give her time. You can withdraw it if you like, but there's no hurry here." Counsel then stated, "[B.H.], you can answer the question when you feel ready." B.H. still did not respond. The trial judge then stated, "State, maybe you can proceed to further questioning for a little bit if you have more." Counsel asked B.H. to identify the defendant in court, which she did. He thereafter stated, "And I'll ask one more time. [B.H.], anything else that you want to add where [the defendant] touched you when he woke you up that morning?" B.H. did not respond verbally. Counsel then stated, "She is nodding, Judge, for the record that she doesn't wish to answer it. No more questions."

¶ 7    Defense counsel requested a short recess, after which he declined to cross-examine B.H. The State then called Robyn Carr to testify. She testified that she was the senior forensic investigator at the Children's Advocacy Center of East Central Illinois (CAC). She testified with regard to her qualifications, certifications, and the general procedures of the CAC, then testified that on March 25, 2019, she conducted an approximately 45-minute forensic interview with B.H. at the CAC. She authenticated People's exhibit No. 1 as a copy of the audio and video recording of that interview. The exhibit was admitted into evidence and immediately published to the jury.

¶ 8    Of significance to this appeal, in the interview that was viewed by the jury, the ceiling-mounted camera showed that B.H. and Carr entered the interview room together, then sat on chairs that were approximately three feet away from each other, with no table or other obstruction between them. Carr gave B.H. some background information about the CAC interview room and ensured that B.H. understood that, if she did not know the answer to a question or did not remember, she should tell that to Carr and that B.H. should only talk about things that B.H. knew "are true and really happened." Carr also told B.H. that, if Carr got "something wrong," B.H. should correct her.

¶ 9    With regard to the alleged incident in this case, B.H. stated that she went to her friend Kyleigh's house "a little bit after school on Friday" and stayed until Sunday. She stated that "Saturday morning is when everything happened." B.H. stated that she and Kyleigh were sleeping on the hide-a-bed in the living room and that "he came over and lay next to me." She stated that he put his arm around her "for a few minutes," then began rubbing her stomach "up and down," then stopped "for a minute," then began rubbing her stomach again and squeezing it. She described the pajamas she was wearing as having an elastic band, and she stated that she felt "his hands kind of going down a little bit." She stated that this happened a few times and that, because she was scared, she tried to move away but could not move and "just froze there."

4

¶ 10 She stated that "eventually" his fingers moved inside her pants and that he "tried to go into [her] underwear," at which point "he didn't really touch [her] private that much, but he did a little bit." She stated that, when Kyleigh's sister Reagan got on the bed, "he moved his hand away really fast" and that he also stopped when the dog got on the bed. She stated that eventually "he started rubbing [her] stomach again," then started trying to "go up" the sports bra she was wearing but "really didn't," and instead "stayed on the outside and was squeezing." B.H. stated that he had his hand on her back and was rubbing her back, and then started rubbing her "butt and was squeezing it" over her pants "for a long time."

¶ 11 B.H. then stated, "I'm going to show you," and stood up. She pointed with her right hand to an area between her legs, approximately midway between her knees and her hips, stating as she did so (and as she quickly then sat back down), "in the middle, down here, he took his finger and started rubbing," which made her "really scared." She stated that, although Kyleigh was in the same bed, right next to her, "even if I did try to say something, I don't know what I would say." She added that "he also smelled really bad," which she described as a "weird body odor."

¶ 12 B.H. stated that she "was kind of scared to go home" because she "didn't really want to talk about" what had happened, so she stayed another night at Kyleigh's house, which she stated she also did because she "really didn't know what to do" and "was just scared." She stated that, for the rest of the weekend, he would stare at her and seem upset if she did not smile at him, so she would smile at him to reassure him "it was okay." She stated that on Sunday morning, he again came into the room where she was sleeping and "held [her] hand." She stated that, when she got home, she did not want to tell her guardian, Betsy, so she called her grandmother in Colorado and told her, then asked her grandmother to tell Betsy, which her grandmother did.

¶ 13 Carr then asked B.H. the name of the man she had been referring to. B.H. answered "Josh" and added that he was "Kyleigh's step-dad" and "the dad of the house." After a discussion of

other matters, Carr eventually asked again about the alleged incident. B.H. stated that "one thing I forgot was he kissed my neck a few times," which she stated made her "really uncomfortable." Subsequently, Carr stated that she wanted to make certain she had all the details correct and so wanted to ask B.H. some specific questions. She asked B.H. to tell her more about the defendant touching B.H.'s "privates." B.H., who was still seated across from Carr, moved her right hand back and forth horizontally near the tops of her thighs, stating "he kind of just like went like halfway, not all the way." She stated that "he didn't really like go fully in my underwear, but he was, he kind of stopped halfway because I wouldn't let him go farther." She stated that she "locked [her] legs shut" but "couldn't move" away because she was frozen and scared. She stated that the defendant tried to move her legs but that she did not let him. She stated that he tried to move her underwear at one point as well.

¶ 14 After a general discussion of other details not relevant to the issues raised on appeal by the defendant, and after Carr briefly left the interview room, Carr returned and thereafter asked B.H. to tell her "where the touching was when you're talking about your privates" and to describe more about when the defendant's hand was in her underwear and "was touching the skin of [her] body." Carr added, "Where did his hand go?" B.H. answered that she was beginning to get "a little bit" of pubic hair and that "when he was kind of like going down a little bit right here"—at which point she touched an area near her genitalia—the defendant "was kind of like *** playing with" her pubic hair and "twisting it around on his finger," which also made her "really uncomfortable." She then moved her right hand back and forth horizontally across her thighs at the point where her legs separated from her midsection and stated, "he kind of got like right to like right about here." She thereafter added, "on my private, through my clothes," he "played around with" her "private." She agreed with Carr's statement that the defendant's hand was "further down" on her "privates" when it was over her clothes than when it was underneath.

6

During the interview, B.H. also explained that it made her uncomfortable to discuss changes in her body, such as puberty, with Betsy.

¶ 15 We note that, although we have described the relevant parts of the entire interview chronologically from start to finish, at trial a short recess was taken at approximately the 18-minute mark of the interview, so that the video could be fast-forwarded past comments of a potentially sexual nature made by B.H. about the defendant and his oldest stepdaughter, as well as about the defendant and another young girl known to B.H., which the parties agreed prior to trial the jury should not hear. During the recess, outside the presence of the jury, defense counsel made the following statement on the record:

"For the benefit of the Appellate Court if, God forbid, this case makes it that far, I as a matter of tactics, decided not to cross-examine the alleged victim, [B.H.]. I did that realizing that it is a massive tactical risk. I did that after consulting with [the defendant], and considering our goal in the litigation. Now, if this tactical decision that I made backfires, that's on me, I understand I can't pass that off on my client. The goal in the litigation for the defendant is not to just beat Count II. If we wanted to resolve this case with a judgment against him on Count I, we had that opportunity. So [the defendant's] goal in this litigation is to win. We think, I think that this is an appropriate tactical decision in light of that goal. We felt that *** cross-examining [B.H.] would have given the State another opportunity to get her to say what they wanted her to say, and we didn't want to give her that chance. If we had cross-examined her, I suppose there could have been a beyond the scope objection if they tried to get back into that, but there is no security in that because that's a matter for the [trial judge's] discretion. Any cross-examination that I would have made of her would have been, you know, specific to the allegations so it probably would not have been beyond the scope for the State's Attorney to redirect her in

7

that fashion. So we recognize that this was a massive tactical risk, but for the benefit of the record, I thought it would be appropriate to explain what we are doing here."

¶ 16 The trial judge then asked the defendant if he disagreed with anything his counsel had stated. The defendant responded, "No." The trial judge then stated the following:

"I would note just for the record, they were lengthy, these periods of silence, and sobbing when the witness, [B.H.,] was on the stand and she was unable to respond to the main question in the State's direct. And I just think that's important to mention that in light of what you said as well."

Following the recess, the remainder of the recorded interview, described in detail above, was played for the jury.

¶ 17 The next witness to testify was Elizabeth "Betsy" Butler. She testified that she was B.H.'s legal guardian and was a friend of B.H.'s mother, who was now deceased. She testified that she had known B.H. since B.H. was two years old. Betsy testified that on Friday, March 8, 2019, B.H. went to a sleepover at the home of her best friend, Kyleigh. She testified that, when she spoke to B.H. on Saturday, B.H. wanted to stay an additional night, which Betsy let her do. Betsy testified that she picked B.H. up on Sunday, March 10, 2019, and that "[w]hen [B.H.] got in the car, I could tell she was a little off. Quiet. Not looking at me." She testified that B.H. was usually "[h]appy *** [c]arefree[, and] adventurous." She testified that instead, B.H. was "really sullen and quiet" on that Sunday. She testified that B.H. later called B.H.'s grandmother and that, when Betsy walked into the room where the call was taking place, B.H. was crying. She testified that, when she asked what was wrong, B.H. asked her to talk to B.H.'s grandmother. As a result of what B.H.'s grandmother told Betsy and as a result of a subsequent conversation between Betsy and B.H., Betsy called the police. Defense counsel declined to cross-examine Betsy.

¶ 18 Jason McFarland testified that he was a police officer with the Effingham Police Department and that on Sunday, March 10, 2019, he was a lieutenant assigned to investigations. He identified the defendant in court, then testified that on March 10, 2019, he received a report from Officer Jason Gouchenour, which led McFarland to speak to B.H. on March 11. He testified that he did not discuss the substance of the allegations with B.H. in much detail at that time, because he wanted her to participate in a forensic interview at the CAC first. McFarland testified that the CAC could not conduct an interview until March 25, due to scheduling issues with CAC staff. He testified that he interviewed the defendant for approximately one hour on March 13, along with Detective Joshua Douthit, and that the interview was audio and video recorded. He authenticated People's exhibit No. 2 as a copy of the audio and video recording of that interview. The exhibit was admitted into evidence and immediately published to the jury.

¶ 19 Of significance to this appeal, in the interview that was viewed by the jury, McFarland and Douthit entered the interview room together, where the defendant was already seated on a chair. After discussions not relevant to this appeal, McFarland began to question the defendant about the incident. The defendant stated that B.H. had spent the entire previous weekend at his house, and his statements about the details of the sleeping arrangements and events of the weekend— other than the alleged improper touching—were for the most part consistent with the statements of B.H. He denied that anything memorable happened over the weekend. He agreed that he got into the hide-a-bed with B.H. and Kyleigh on Saturday morning but stated that it was not unusual for his two youngest stepdaughters, Kyleigh and Reagan, to climb into his bed, with their mother present as well, or to want to be hugged. The defendant denied that he touched B.H., even inadvertently or in a way that could be misconstrued by her, while he was on the hide-a-bed with B.H. and Kyleigh.

9

¶ 20   Douthit then told the defendant that it was "very clear" from talking to B.H. and others that touching occurred on the bed and that the officers needed to understand the specifics of it and whether it was innocent or not. He stated that the defendant needed to be honest with them. The defendant stated that he and B.H. "wrestled" on the bed a little on Friday night, as he often did with his kids and their friends, but stated that there was nothing of a sexual nature about it. Douthit then asked him to be "very specific" about any contact with B.H. on the hide-a-bed on Saturday morning. The defendant stated that he did not remember any contact on Saturday morning, although he remembered that B.H. asked him for a hug on Sunday morning and that he gave her one then.

¶ 21   The defendant stated that, on Saturday night, Kyleigh fell asleep on the bed, with her head on his chest, while the others watched a scary movie and that B.H., who was facing away from him, held onto his hand at times during the movie because she was scared. He stated that, during that time, B.H. sometimes moved or pulled on his hand and arm, including onto her "side," which he thereafter described as around her hip and leg area. He denied that his hand or arm were ever on any part of her body that was "inappropriate." He denied that any part of his body other than perhaps his "upper" arm could have touched B.H.'s breasts when she was pulling on him.

¶ 22   McFarland then mentioned that "in this day and age *** kids get sexualized very early" and that some girls become "hyper-sexualized at that age," which he suggested could lead a child to take the sexual initiative with an adult. He then stated that he had spoken with B.H. and believed her when she said that touching had occurred but was not sure if she had told him the entire truth about what happened. The defendant denied that B.H. had made sexual advances toward him and continued to deny that any inappropriate touching occurred but reiterated that the upper part of his arm could have "brushed across" B.H.'s chest when she was pulling on it during the scary movie. McFarland then discussed DNA evidence and asked if there was any

reason the defendant's DNA would be on B.H.'s underwear and bra. The defendant answered "No" and thereafter stated, when asked, that he would give a DNA sample that day. He thereafter reiterated that his DNA would not be on her bra and underwear and again offered to give a DNA sample. He stated that possibly DNA could be on B.H.'s pajama pants because of the innocent contact they had during the movie, but not in the area of her vagina or buttocks.

¶ 23 Subsequently, Douthit again emphasized that the defendant needed to be truthful with the officers because they found B.H. to be "super believable" and needed to hear his side of what happened. The defendant continued to deny that there was inappropriate contact and stated that the only possible explanation for B.H.'s contention that she was touched inappropriately was inadvertent or accidental touching near her vagina or buttocks when she pulled on his arm during the movie. McFarland again brought up the DNA evidence, telling the defendant that it was important for his statements to the officers to match up with any DNA evidence that was later discovered. He again mentioned the possibility that B.H. initiated sexual contact with the defendant, such as by sticking the defendant's hand down her pants, and stated, as he had previously, that he believed the defendant's DNA would be found on B.H.'s underwear.

¶ 24 The defendant thereafter stated that he remembered feeling B.H.'s "stomach" when she clinched the defendant's hand and arm because B.H. was wearing a shirt that was short and would "slide" but that B.H. did not put the defendant's hand or arm down her pants. When again asked when this touching occurred, he again stated that he was talking about Saturday night, when they all watched the movie together. When asked if there was a possibility that his hand touched her underwear or pajama pants, the defendant answered, "It may have, depending on *** where" her clothing was exactly on her body. He stated that he was paying attention to the movie, not her. He stated that at times he moved his arm back to its original position, because it was sometimes uncomfortable when B.H. was pulling on it, and that he could have accidentally touched her at

11

those times too. He stated that, if B.H. thought he touched her inappropriately, it was "totally a misunderstanding" on her part. When asked, he reiterated that, if B.H. "got touched," it was not intentional.

¶ 25 Douthit again emphasized that the officers believed B.H. and were trying to figure out what happened. He stated that he believed there was definitely rubbing of the vagina area over the clothing. The defendant stated that there may have been "inadvertent" or "accidental" touching but thereafter stated that the only way that was possible was if it happened while B.H. had her arms wrapped around his arms as they watched the scary movie. When asked about Saturday morning, he again stated that nothing happened at that time, although he gave her a hug on Sunday morning. He then stated, "come to think about it, it was Saturday morning too." Douthit then asked the defendant to "walk [Douthit] through Saturday."

¶ 26 The defendant stated that "nothing" happened and that he got on the hide-a-bed, where the girls were both "on their phones" and where he stayed and talked to them for "a while." With regard to the way he hugged B.H. on Saturday morning, the defendant stated that B.H. was lying down and he was standing up, so he put his arms "lower" near her "lower back." He denied that he could have touched her buttocks. As far as touching B.H. while they were both lying in the bed, he said it would have only occurred because she was lying "right next to" him. He stated that it was "pretty much the exact same thing" on Saturday and Sunday.

¶ 27 Douthit thereafter asked if the defendant believed B.H. was trustworthy and then asked if he thought she could be imagining being touched on the waist or buttocks or would "make this up." The defendant stated that he did not think so. Douthit then gave the defendant some of the details about B.H.'s allegations of the defendant touching her, including that B.H. stated that she felt the defendant touching her buttocks area and below her waist area where her vagina would be. Douthit asked, "Can you explain that to us please?" The defendant answered, "No, I can't

12

explain it to you." He denied that he embraced or hugged B.H. while the two were together in the bed, reiterating that he hugged her only when he was standing up and she was lying on the bed.

¶ 28 McFarland then left the interview room, and Douthit mentioned to the defendant that the defendant should think about B.H., and not putting her "through a long ordeal," and should explain any innocent touching that may have happened and been misunderstood by B.H. Douthit stated that there had to be an explanation because B.H. "didn't just make up that she was touched in the buttocks and the vagina area." The defendant stated that if he touched "her anywhere around there" it was "certainly *** inadvertently." Douthit asked him if he remembered doing that. The defendant stated that he did not. He also stated that if he touched her while they were all wrestling around, that was inadvertent as well and that, if that happened, he was "very, very sorry, but it wasn't intentional in any way."

¶ 29 After more questioning, Douthit told the defendant, "I know you want to say what happened." The defendant continued to deny that he intentionally touched B.H. in a sexual way and continued to state that he did not remember touching her, although he reiterated that when he hugged her, it was on her lower back, which he noted was near the top of her butt. He stated, "Maybe that's what it was." Douthit asked if that would explain the defendant's DNA being in that area, to which the defendant answered, "Yes, that would be the reason." He reiterated that, to the extent he hugged her in the bed, any inappropriate touching was inadvertent and involved, at most, her buttocks. He again denied that he touched her in "the front." He conceded that he might have touched her "around the waistline" when removing his hand after the hug, but "no lower." Douthit asked him if he was "sure," to which the defendant responded, "Yes." The officers then took a DNA sample from the defendant and concluded the interview, telling the

13

defendant that, if he thought of anything else they should know, he should ask to speak to them again.

¶ 30   After the interview was played for the jury, McFarland testified that, although the DNA sample was taken, it was not sent off for analysis, because officials at the crime lab indicated that, based upon the allegations in this case, it was highly unlikely there would be any DNA found. Following McFarland's testimony, the State rested its case. Outside the presence of the jury, defense counsel made a motion for a directed verdict with regard to both counts. Counsel stated that he would focus his remarks on count II, predatory criminal sexual assault of a child. He argued that "[t]here has been no testimony, either live testimony or in the statements [of the defendant and B.H.] that there was any contact of any nature between [the defendant's] finger and the vagina of" B.H. He argued that, accordingly, there was simply no evidence to support count II. Counsel for the State countered that B.H.'s CAC interview—which he reminded the court could be considered as substantive evidence by the jury pursuant to Illinois statute— included statements from her that the defendant touched her pubic hair and included her pointing "to exactly the area where he stops underneath her underwear." Counsel argued that "[i]t can be inferred by a jury that he was at the beginning or start of her genitals which would be the vagina in this case and a reasonable jury can make that inference." The trial judge stated that he agreed, and he denied the defendant's motion for a directed verdict.

¶ 31   The first witness to testify on behalf of the defendant was Kyleigh O'Dell. She testified that the defendant was her stepfather. When asked if she remembered the weekend that B.H. last spent the night with her at her house, Kyleigh testified, "Not that much but I do some." She agreed that B.H. came over on Friday night. She testified that she and B.H. slept together on the hide-a-bed in the living room and that two of her siblings slept in the living room with them as well. She did not know why the four of them slept in that room instead of their bedrooms. When

14

asked if the defendant got in the hide-a-bed with Kyleigh and B.H., Kyleigh testified, "No. I don't think so." She testified that she did not see the defendant touch B.H. She testified that on Saturday night, they watched a movie together. She testified that she and B.H. were on the hide-a-bed and that she could not remember where the defendant was sitting, although he was watching the movie with them. Kyleigh testified that she did not recall anything happening during the movie and that they slept in the living room again that night. She testified that on Sunday morning, the defendant came into the living room to say hi to everyone. She did not see anything happen between the defendant and B.H. She testified that, when it was time for B.H. to go home, B.H. "basically, kind of started crying, being like she started whining because she said she didn't like Betsy." At no point did Kyleigh testify to any physical contact, whether accidental, incidental, or purposeful, between the defendant and B.H.

¶ 32    The next witness to testify on behalf of the defendant was Reagan O'Dell. She testified that she was 14 years old and that she lived with, *inter alia*, the defendant (who is her stepfather) and Kyleigh. She testified that among the furniture in her living room was a hide-a-bed. Reagan testified that she remembered the last time B.H. slept over at her house. She testified that B.H. came over on that Friday afternoon and that all she could remember about that night was them watching a movie together. She testified that she saw B.H. and Kyleigh on the hide-a-bed on Saturday morning but did not see the defendant there. She did not remember anything she did on Saturday or Saturday night. She testified that B.H. and Kyleigh slept in Kyleigh's room on Saturday night. She testified that she remembered that on Sunday, when it was time for B.H. to go home, B.H. "was crying because she didn't want to leave." Reagan testified that she never saw the defendant touching B.H. at any time during the weekend. At no point did Reagan testify to any physical contact, whether accidental, incidental, or purposeful, between the defendant and B.H. The State declined to cross-examine Reagan, and thereafter, the defendant rested his case

15

and, outside the presence of the jury, again argued for a directed verdict on count II. The trial judge again agreed with the State that there was sufficient evidence for the case to go to the jury, stating that, in his "recollection of the video, she pointed specifically to the area immediately between her legs, which obviously would be indicative of her genitalia."

¶ 33 A jury instruction conference followed. Neither party objected to any of the proposed instructions. The following morning, February 28, 2020, the trial resumed, with the parties delivering their closing arguments. Counsel for the State acknowledged that at trial B.H. "kind of got quiet and never fully answered the question" about being "touched below near her genitalia" but reminded the jurors that they could consider her CAC interview, in which she stated, *inter alia*, that the defendant "rubbed the outside of her genitals over the clothes." Counsel argued that B.H. was believable because she "didn't equivocate[,] *** was not evasive[, and] *** was not inconsistent." Counsel also pointed out that, during her CAC interview, B.H. was very descriptive, including facts such as that the defendant had a strong body odor and that B.H. disclosed the abuse in a timely manner on the day she returned home from the defendant's house. He argued that the defendant's statement corroborated B.H. because in his statement, the defendant admitted that he was in the hide-a-bed with B.H., whereas the testimonies of both Kyleigh and Reagan "were all over the place," which made them "simply not believable" as witnesses. Counsel for the State played part of People's exhibit No. 2 for the jury, pointing out that the defendant admitted to (1) lying on the hide-a-bed beside B.H., (2) touching B.H.'s stomach, then her side, near her hip, and (3) possibly having his hand on her underwear.

¶ 34 With regard to the charges the State was required to prove, counsel thereafter argued to the jury that "[y]ou can draw the inference that if you are playing with somebody's pubic hair near the region she was pointing, he was making contact with her vagina. It's perfectly plausible that happened." Counsel for the defendant, on the other hand, argued that, in essence, the defendant

16

was coerced by the police into confessing to things he did not do because he was questioned over and over again by the officers about the same things and because the officers would not accept his innocent answers for what happened. He did not argue, at all, that, anatomically speaking, it was not physically possible for the defendant to have touched B.H.'s vagina or that the evidence showed, at most, that the defendant touched only B.H.'s pubic hair.

¶ 35   The trial judge thereafter instructed the jury, *inter alia*, that, to find the defendant guilty beyond a reasonable doubt of the charge found in count II, the jury must conclude that, *inter alia*, "the defendant knowingly committed an act of contact, however slight, between the sex organ of one person and the body part of another for the purposes of arousal of the defendant." The trial judge also instructed the jury, *inter alia*, that (1) "[c]ircumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant" and (2) "[c]ircumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict." Outside the presence of the jury, the trial judge noted that he was not sending the video exhibits back to the jury unless they requested to watch them again, in which case he would inform the parties and they would "decide how we wish to proceed." The jury did not request to view the video exhibits or send any other kind of note to the judge. The jury found the defendant guilty of both counts against him.

¶ 36   On March 2, 2020, the defendant filed a motion for acquittal or, in the alternative, for a new trial. Therein, he contended, *inter alia*, that he was not proven guilty beyond a reasonable doubt of either count. He did not allege that the trial judge failed to properly admonish the jury in any way. Subsequently, the defendant hired new counsel to assist him. New counsel did not file a new posttrial motion, opting instead to stand on the motion filed by the defendant's prior counsel. On July 27, 2020, a hearing on the motion was held. Defense counsel renewed,

17

*inter alia*, the argument that there was not sufficient evidence presented at trial to support a finding of guilt on count II. The trial judge denied the motion, noting, *inter alia*, his recollection that B.H. "appeared quite believable" and that, even though she "froze up and started to cry" during her testimony at trial, that testimony, coupled with her CAC interview, provided sufficient evidence to support the jury's finding of guilt.

¶ 37   Thereafter, the case proceeded to sentencing. Ultimately, the defendant was sentenced to five years in IDOC on the count of aggravated criminal sexual abuse (count I) and eight years in IDOC on the count of predatory criminal sexual assault of a child (count II), with the sentences to be served consecutively and followed by a term of MSR. This timely appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39   On appeal, the defendant contends that (1) the State failed to prove him guilty beyond a reasonable doubt of count II, "because vague descriptions of alleged touching of the pubic hair do not prove the specific touching necessary for predatory criminal sexual assault" of a child and (2) the trial judge erred when he "failed to ask the potential jurors if they both understood and accepted the *Zehr* principles." With regard to his first contention, he posits that, "where the State charged [the defendant] with touching B.H.'s vagina, it was required to present proof of an intrusion into B.H.'s body to prove [the defendant] guilty beyond a reasonable doubt" and, in the alternative, posits that, as used in the jury instructions, "the term 'sex organ' is too vague and does not encompass nearly as much as the State argues," which means that, "[u]nder the rule of lenity, a bare allegation that a defendant touched a victim's pubic hair should not be seen as proof beyond a reasonable doubt that there was touching of the sex organ for purposes of the statute" in question. He acknowledges the State's argument that the jury could infer from B.H.'s testimony and her CAC interview that the defendant touched her vagina but argues that "the evidence does not present such an inference, and the State did not present any other evidence that

18

would prove the predatory charge beyond a reasonable doubt." He further argues that "this Court should hold the State to the manner in which it charged the crime, which required the State to prove that [the defendant] touched B.H.'s 'vagina'—and not just her 'sex organ'—beyond a reasonable doubt." He posits that "[i]n order to do that, as shown by Illinois case law, the State was required to prove that [the defendant's] finger made an intrusion into B.H.'s body."

¶ 40   With regard to his second contention, the defendant argues that the trial judge "asked if the potential jurors *accepted* the [*Zehr*] principles without asking if they *understood* them." (Emphases in original.) He contends that the evidence in this case was closely balanced and that, accordingly, reversal of the defendant's convictions is required. He acknowledges that this purported error was not preserved in the trial court but asks this court to consider it under the first prong of the plain-error doctrine, described in more detail below.

¶ 41   The State responds to the defendant's first contention of error by asserting, as it did in the trial court, that there was in fact sufficient evidence to convict the defendant of both charges and lays out some of that evidence in its brief on appeal. The State also notes that the defendant did not raise his "vagina" versus "sex organ" argument in the trial court and contends that, in any event, the State did not have to prove a "bodily intrusion" into B.H.'s vagina. The State argues that the jury was properly instructed that what was required to be proven to sustain count II was "an act of contact, however slight, between the sex organ of one person and the part of the body of another." The State notes that the defendant did not challenge the jury instructions at trial or in his opening brief on appeal. The State further notes that, even if this court does not find the defendant's "vagina" versus "sex organ" argument to be forfeited, it is without merit, because "the statutory term 'sex organ' is not ambiguous." The State responds to the defendant's second contention of error by conceding that the trial judge erred by failing to ask the potential jurors if they understood the *Zehr* principles but posits that the defendant is not entitled to invoke plain-

error review in this case because the defendant cannot meet his burden to "show that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice." The State notes that, to determine this question, this court must conduct a qualitative, commonsense assessment of the totality of the evidence presented at trial.

¶ 42   In his reply brief, the defendant, *inter alia*, reiterates his arguments with regard to the sufficiency of the evidence, clarifies that he is not contesting the validity of the charging instrument or the propriety of the jury instructions, and presents argument for why he believes the evidence in this case was closely balanced and why, therefore, the trial judge's *Zehr* principles error requires reversal and remand for a new trial.

¶ 43   We first note that we agree with the State that *de novo* review is not appropriate with regard to the first issue raised by the defendant in this case. As the State points out, in *People v. Curry*, 2018 IL App (1st) 152616, ¶ 16, our colleagues in the First District reiterated the well-established principle of law that *de novo* review applies only when the facts are not in dispute and the defendant's guilt under the undisputed facts is a question of law. In this case, the fact of whether the defendant touched B.H.'s vagina is very much in dispute and has been since trial. Therefore, the defendant's challenge on appeal is clearly a challenge to whether the evidence adduced at his trial was sufficient to support his conviction for count II. When a defendant challenges the sufficiency of the evidence used to convict that defendant, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416-17 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* at 416. We allow all reasonable inferences from the record in favor of the

20

prosecution, whether the evidence in the case is direct or circumstantial. *Id.* There is no requirement that this court disregard inferences that flow from the evidence or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw conclusions based on all the evidence properly before the trier of fact. *Id.* As we undertake our review of the evidence under the above standard, we are mindful of the fact that it is axiomatic in Illinois that the testimony of a single witness, if positive and credible, is sufficient to sustain a criminal conviction, even if the testimony is disputed by the defendant. See, *e.g.*, *People v. Loferski*, 235 Ill. App. 3d 675, 682 (1992).

¶ 44 In this case, as described above, the defendant challenges the sufficiency of the evidence used to convict him of count II. He does not challenge the sufficiency of the evidence used to convict him of count I. As also described above, count II alleged the offense of predatory criminal sexual assault of a child and specifically alleged that between March 8, 2019, and March 10, 2019, the defendant "knowingly committed an act of sexual contact with B.H., who was under 13 years of age when the act was committed, in that the [d]efendant touched the vagina of B.H. with his finger for the purpose of sexual arousal of the defendant." The jury was instructed that, to find the defendant guilty of this count, the jury was required to conclude that the State had proven beyond a reasonable doubt that, *inter alia*, "the defendant knowingly committed an act of contact, however slight, between the sex organ of one person and the body part of another for the purposes of arousal of the defendant." In closing argument, the State specifically argued that the jury should find that the defendant touched B.H.'s vagina, stating, "You can draw the inference that if you are playing with somebody's pubic hair near the region she was pointing, he was making contact with her vagina. It's perfectly plausible that happened."

21

¶ 45 On appeal, the defendant—while simultaneously claiming not to challenge the jury instructions or the charging instrument—makes much of the distinction between "sex organ" and "vagina" and claims that the State was required to prove some penetration, however slight, of B.H.'s vagina by the defendant's finger. For the following reasons, we conclude that, even if we assume, *arguendo*, that the defendant is correct that the State was required to prove some penetration, however slight, of B.H.'s vagina by the defendant's finger, the evidence adduced at trial was sufficient to sustain the defendant's conviction for count II.

¶ 46 We begin our analysis of the defendant's arguments on this issue by noting that they all are built upon the premise, repeated multiple times throughout his briefs on appeal, that "the evidence put forward by the State only suggests a touching of B.H.'s pubic hair." We reject this premise, as it is factually incorrect. It is certainly true that in the CAC interview that was presented to the jury as substantive evidence, B.H. was asked to tell "where the touching was when you're talking about your privates," to describe more about when the defendant's hand was in her underwear and "was touching the skin of [her] body," and to answer Carr's question, "Where did his hand go?" It is equally true that B.H. answered that she was beginning to get "a little bit" of pubic hair and that "when he was kind of like going down a little bit right here"—at which point she touched an area near her genitalia—the defendant "was kind of like *** playing with" her pubic hair and "twisting it around on his finger."

¶ 47 However, at no point did B.H. state that the defendant touched *only* her pubic hair. To the contrary, at the outset of the CAC interview, B.H. stated that the defendant climbed onto the hide-a-bed with her, put his arm around her "for a few minutes," then began rubbing her stomach "up and down," then stopped "for a minute," then began rubbing her stomach again and squeezing it. She described the pajamas she was wearing as having an elastic band, and she stated that she felt "his hands kind of going down a little bit." She stated that this happened a few times

and that, because she was scared, she tried to move away but could not move and "just froze there." B.H. stated that "eventually" the defendant's fingers moved inside her pants and that he "tried to go into [her] underwear," at which point "he didn't really touch [her] private that much, but he did a little bit."

¶ 48 A rational jury, having heard both that the defendant "played with" B.H.'s pubic hair and that, when he "tried to go into [her] underwear," he touched her "private *** a little bit," could have concluded beyond a reasonable doubt that both contacts occurred, perhaps within seconds of each other, and could have concluded beyond a reasonable doubt that the defendant's touching of B.H.'s "private" constituted penetration, however slight, of her vagina. There is certainly nothing unreasonable, improbable, or unsatisfactory about B.H.'s statements or about that conclusion (see *Saxon*, 374 Ill. App. 3d at 416), as the conclusion is a reasonable inference from her statements (see *id.*). This is particularly true in light of B.H.'s other CAC interview statements and physical gesturing, described in detail above, in which she consistently used the word "private" to describe the area he touched and during which she gestured, multiple times, to an area of her body that a rational jury could have concluded was meant to encompass her vagina to an extent that penetration, however slight, could have occurred when the defendant touched her "private *** a little bit."

¶ 49 Such a conclusion by a rational jury also would not be inconsistent with B.H.'s gesturing and verbal statement later in the CAC interview when she was asked to tell Carr more about the defendant touching B.H.'s "privates." B.H., who was still seated across from Carr, moved her right hand back and forth horizontally near the tops of her thighs, stating "he kind of just like went like halfway, not all the way." She stated that "he didn't really like go fully in my underwear, but he was, he kind of stopped halfway because I wouldn't let him go farther." She stated that she "locked [her] legs shut" but "couldn't move" because she was frozen and scared.

23

She stated that the defendant tried to move her legs but that she did not let him. Having heard this and having heard B.H.'s clear and unequivocal statement that the defendant touched her "private *** a little bit," a rational jury could have concluded beyond a reasonable doubt—and without venturing into the realm of impermissible speculation—that, even if the defendant's entire hand did not "go fully" into B.H.'s underwear, if it went, as B.H. stated, "halfway"— because B.H.'s locking of her legs stopped it from going farther—one or more of the defendant's fingertips still could have penetrated B.H.'s vagina, depending upon the size, type, and position of her underwear, the relative position of his hand and fingers to her vagina, and the angle at which the defendant was attempting to enter her underwear. This is particularly true in light of B.H.'s statement that the defendant tried to "move" her underwear at one point as well.

¶ 50   Likewise, although B.H. agreed with Carr's statement that the defendant's hand was "further down" on her "privates" when it was over her clothes than when it was underneath, this was in no way inconsistent with slight penetration of her vagina occurring when part of the defendant's hand was inside of B.H.'s underwear and touching her "private *** a little bit." In sum, there was nothing inconsistent between any of B.H.'s later statements and gestures and her earlier statement—which we reiterate was clear and unequivocal—that the defendant touched her "private *** a little bit." Moreover, as explained above, when this court reviews a challenge to the sufficiency of the evidence, we allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial, and we remain mindful of the fact that there is no requirement that we disregard inferences that flow from the evidence, or that we search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. See *id.*

¶ 51   In addition, we reject the defendant's argument that B.H.'s statements should be viewed with some skepticism because the CAC interview did not occur until approximately two weeks

after the incident in question. It is clear from viewing the CAC interview that B.H. had a detailed, consistently described memory of the incident, and we do not believe that two weeks is such a long period of time as to inherently distort B.H.'s memory and render her statements suspect or unreliable. We note as well that, as described above, after Carr gave B.H. some background information about the CAC interview room, she ensured that B.H. understood that, if she did not know the answer to a question or did not remember, she should tell that to Carr and that B.H. should only talk about things that B.H. knew "are true and really happened." Carr also told B.H. that, if Carr got "something wrong," B.H. should correct her. For all of the foregoing reasons, we conclude there was sufficient evidence for a rational jury to find the defendant guilty, beyond a reasonable doubt, of count II.

¶ 52   Having concluded that the defendant's first argument on appeal fails, we turn to his second argument: whether the trial judge's purported *Zehr* principles error requires reversal and remand for a new trial. As noted above, the four *Zehr* principles are that a defendant (1) is presumed innocent of the charge(s) against him or her, (2) is not required to offer any evidence on his or her own behalf, (3) must be proved guilty beyond a reasonable doubt, and (4) may not have his or her failure to testify held against him or her. See *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). A trial judge must ensure that each prospective juror both understands and accepts each of the four principles. See, *e.g.*, *People v. Olla*, 2018 IL App (2d) 160118, ¶ 29. It is error for a trial judge "to ask the prospective *** jurors whether they agree with the principles but fail to also ask whether they understand them." *Id.* Thus, as the defendant alleges in this case and as the State agrees, there was error because, as described above, the trial judge asked each potential juror if that juror heard the four principles, agreed with them, and accepted them to be true, but he did not ask any of the potential jurors if they understood the four principles.

¶ 53    Because the defendant did not object at trial to this error, we must determine whether he is entitled to relief under the plain-error doctrine. *Id.* ¶ 27. For purposes of a *Zehr* principles error, plain-error review is available in two general circumstances: where the error produced a biased jury or where the evidence of guilt was closely balanced. *Id.* ¶ 31. Here, the defendant argues for the latter circumstance, contending that the evidence of guilt was closely balanced. He does not argue that the error produced a biased jury. Accordingly, to be entitled to relief in this case, the defendant bears the burden of persuasion to demonstrate that the evidence adduced at trial "was so closely balanced [that] the error alone severely threatened to tip the scales of justice" against the defendant. *People v. Sebby*, 2017 IL 119445, ¶ 51. To determine if the evidence meets the standard of being this closely balanced, this court evaluates the totality of the evidence and conducts a qualitative, commonsense assessment of it within the context of the case. *Olla*, 2018 IL App (2d) 160118, ¶ 32. This requires us to assess the evidence with regard to the elements of the charged offense or offenses, along with any evidence regarding the credibility of the witnesses. *Id.* If the outcome of a case depends on a choice between two versions of facts that both are credible, the evidence may be deemed to be closely balanced. *Id.* ¶ 34. This also may be true "when witnesses for the State and witnesses for the defense gave plausible opposing versions of the events, neither of which was corroborated by extrinsic evidence." *Id.* Courts must be careful not to brand the testimony of the defendant's witnesses as less plausible merely because those witnesses were relatives or friends of the defendant and might be biased. *Id.*

¶ 54    On the other hand, evidence is not closely balanced, and there is no " 'credibility contest,' " if one party's version of the facts is implausible or if one party's version of the facts is corroborated by other evidence. *Id.* ¶ 35. In the context of cases, such as this one, that involve charges and convictions for offenses such as predatory criminal sexual assault of a child and aggravated criminal sexual abuse, a commonsense assessment of the evidence may include

examining whether (1) the victim had a motive to lie, (2) other evidence exists to explain the victim's knowledge of sexual acts, and (3) the defendant's own statements or testimony corroborate some or all of the allegations. *Id.* ¶¶ 36-37. There is no requirement that the evidence must be overwhelming for it to be considered not closely balanced for purposes of plain-error review. *Id.* ¶ 38.

¶ 55 Accordingly, we now evaluate the totality of the evidence presented at trial and conduct a qualitative, commonsense assessment of it within the context of this case. See *id.* ¶ 32. As described above, B.H.'s CAC interview statements and testimony at trial presented a clear and consistent version of what happened on Saturday morning on the hide-a-bed, and also as described in detail above, the CAC statements—which were both credible and plausible—were sufficient to prove beyond a reasonable doubt the elements of the offenses with which the defendant was charged. See *id.* There is nothing in the record on appeal—at all—that suggests that B.H. had a motive to lie about what happened (see *id.* ¶¶ 36-37) or that suggests that at the time of the incident she was anything other than a normal 11-year-old, sixth-grade girl. Indeed, in his statement to McFarland and Douthit, even the defendant stated that he did not believe B.H. would "make this up." With regard to whether other evidence exists to explain the victim's knowledge of sexual acts (see *id.*), we do not believe this factor is relevant in this case, because B.H.'s account of what happened did not involve recounting knowledge of explicit sexual acts that a girl of her age would be unlikely to know and the words that she did use to describe the touching that occurred—such as "privates" and "pubic hair"—were age-appropriate. With regard to whether the defendant's own statements or testimony corroborate some or all of the allegations (see *id.*), we discuss this factor in detail below.

¶ 56 With regard to other aspects of the State's evidence, we agree with the State that Betsy's testimony about B.H.'s withdrawn and sullen behavior after the sleepover, as well as Betsy's

27

testimony about what she observed during B.H.'s phone call with B.H.'s grandmother in Colorado, corroborates to some extent the State's theory that B.H. was sexually assaulted by the defendant at the sleepover. Although the defendant contends that B.H.'s request to spend an additional night at the defendant's house calls into question B.H.'s contention that an assault occurred, B.H. explained this in her CAC interview, stating that she "was kind of scared to go home" because she "didn't really want to talk about" what had happened, so she stayed another night at Kyleigh's house, which she stated she also did because she "really didn't know what to do" and "was just scared." This was completely consistent with B.H.'s many other assertions, during the CAC interview, that she was very scared and uncomfortable during the assault and was consistent with the testimony of Kyleigh and Reagan that on Sunday, B.H. was crying because she did not want to go home. It was also completely consistent with B.H.'s explanation, during the CAC interview, that she was uncomfortable discussing things like puberty with Betsy, which is why she called her grandmother in Colorado and asked her to tell Betsy what happened, rather than B.H. telling Betsy.

¶ 57   Having concluded that B.H.'s testimony and statements in this case were both credible and plausible and were corroborated to some extent by Betsy's testimony about B.H.'s post-sleepover behavior, we must determine whether the defendant and his witnesses at trial also presented a credible and plausible version of events, and whether, therefore, the evidence in this case was closely balanced. See *id.* ¶ 34. As we consider the evidence put forward by the defendant at trial, we are mindful of the fact, explained above, that courts must be careful not to brand the testimony of the defendant's witnesses as less plausible merely because those witnesses were relatives or friends of the defendant and might be biased. See *id.* In this case, however, with regard to the testimony of the defendant's stepdaughters, Kyleigh and Reagan, there is no need for this court to assess their credibility or the plausibility of their testimony, because both witnesses testified

28

that they did not remember much about the sleepover and both testified that they did not see the defendant touch B.H. at all—in fact, as explained above, at no point did Kyleigh or Reagan testify to any physical contact, whether accidental, incidental, or purposeful, between the defendant and B.H.—whereas the defendant stated to the police that some innocent, inadvertent touching may have occurred, either when (1) he "wrestled" playfully with B.H., (2) he "hugged" B.H., (3) he lay in the hide-a-bed with her in the morning, or (4) the scary movie was on during the evening, but that any touching that happened during these times was not of a sexual nature.

¶ 58   Thus, the testimony of the defendant's two witnesses—which we reiterate was the only evidence the defendant presented—does not corroborate the defendant's version of the facts with regard to the key issues that were determinative of whether the defendant was guilty of the charged offenses, as stated in the indictment and as argued by the State at trial: whether, for count I, he "knowingly touched the breast of B.H. with his hand for the purpose of sexual arousal of the defendant" and whether, for count II, he "knowingly *** touched the vagina of B.H. with his finger for the purpose of sexual arousal of the defendant." Indeed, Kyleigh's testimony and Reagan's testimony to some extent contradict the defendant's version of the events in question, because Kyleigh testified that she did not think the defendant ever got into the hide-a-bed with her and B.H., whereas the defendant freely admitted that he did get into the hide-a-bed with the girls, both on Saturday morning and on Sunday morning, and while watching the scary movie on Saturday night. Reagan testified that she did not see the defendant on the hide-a-bed on Saturday morning. We therefore conclude that the evidence put forward by the defendant at trial is of little probative value when considering whether the evidence that the defendant committed the offenses was closely balanced for purposes of plain-error review, because it certainly cannot be said to corroborate the defendant's version of the events, as ascertained by the jury when it viewed the defendant's statement to McFarland and Douthit.

¶ 59 We return, therefore, to the question of whether the defendant's own statements or testimony corroborate some or all of the allegations against him. See *id.* ¶¶ 36-37. On appeal, the defendant contends that, for purposes of plain-error review, "the evidence at trial simply came down to B.H.'s accusations and [the defendant's] recorded statements" and posits that his recorded statement "presents a counter to B.H.'s testimony, and demonstrates that, at the very least, this was a credibility contest, so the case is necessarily closely balanced." The State, however, is correct that the defendant's recorded statement in fact corroborates the allegations against him in multiple ways, such as the fact that B.H. slept over the entire weekend, the sleeping arrangements, and the fact that the defendant was in the hide-a-bed with B.H. and Kyleigh on Saturday morning.

¶ 60 The State is also correct that the defendant's initial denial that he hugged B.H. on Saturday morning—and his focus instead on the events he alleged occurred while they were watching a scary movie on Saturday night—could be construed as an attempt to deflect the officers' attention away from Saturday morning, which the defendant knew was when the assault in question actually occurred. This, in turn, could be construed as a further corroboration of B.H.'s statement that the assault took place as she claimed on Saturday morning. Notably, no other witness provided a statement or testimony that corroborated the defendant's contention that B.H. held onto the defendant's hand and arm and pulled them onto parts of her body as the group watched a scary movie together on Saturday night, which further calls into question the defendant's credibility and all of his statements about what happened on the weekend in question. Likewise, although the defendant claimed that he "wrestled" around with B.H. on the bed in an innocent manner on Friday night—a claim the defendant made after Douthit told the defendant that it was "very clear" from talking to B.H. and others that touching occurred on the bed—no other witness corroborated the defendant's claim, and in fact the testimony of both Kyleigh and Reagan,

30

discussed in detail above, calls the defendant's claim into question. This too diminishes the credibility of the defendant and the plausibility of his explanations of innocent contact with B.H., which in turn leads to the reasonable inference that his uncorroborated assertions of playful, innocent, or inadvertent contact with B.H. were nothing more than fabrications to attempt to explain away the presence of any physical evidence, such as DNA, the police might uncover.

¶ 61 Indeed, we agree with the State that the defendant's "evolving story about the physical touching significantly diminished his credibility," and we conclude that it ultimately rendered his version of events to be not plausible. As McFarland and Douthit repeatedly stated that they believed B.H. was credible and repeatedly stated that they believed the defendant's DNA would be found on B.H.'s underwear, the defendant adapted his story multiple times and in multiple ways, including shifting his narrative so that he *did* hug B.H. on the hide-a-bed on both Saturday and Sunday, rather than hugging her only on Sunday as he first claimed, all apparently in an effort to provide a potentially innocent explanation for the presence of his DNA on B.H.'s underwear, were it to be found there. Common sense dictates that there is no rational explanation for why the defendant would believe his DNA might be found on B.H.'s underwear other than that he knew more touching had occurred than he initially admitted had occurred. As the State notes, the defendant went from denying any contact—even innocent or inadvertent contact— occurred, to stating that touching might have occurred but that, if it did, it was innocent, accidental contact of a nonsexual nature. By the end of his interview, the defendant was stating that "accidental" touching of B.H.'s stomach, chest, buttocks, and/or the area near her vagina could have occurred. These are, of course, the very areas that B.H. alleged the defendant touched—intentionally and repeatedly—as he proceeded with his assault of her on that Saturday morning.

31

¶ 62 As explained above, evidence is not closely balanced, and there is no " 'credibility contest' " if one party's version of the facts is implausible *or* if one party's version of the facts is corroborated by other evidence. See *id.* ¶ 35. Our qualitative, commonsense assessment of the evidence in this case demonstrates, for the reasons explained above, *both* that the defendant's changing explanations regarding his physical contact with B.H. were not credible, plausible, or corroborated *and* that B.H.'s version of the facts was credible, plausible, and corroborated—at least to some extent—by other evidence presented at trial. Accordingly, we conclude that the defendant has not met his burden of persuasion to demonstrate that the evidence adduced at trial "was so closely balanced [that] the [*Zehr* principles] error alone severely threatened to tip the scales of justice" against the defendant. *Sebby*, 2017 IL 119445, ¶ 51. For that reason, he is not entitled to reversal and remand for a new trial on the basis of the trial judge's *Zehr* principles error. See, *e.g.*, *Olla*, 2018 IL App (2d) 160118, ¶ 27.

¶ 63                                 III. CONCLUSION

¶ 64 For the foregoing reasons, we affirm the defendant's convictions, as well as his unchallenged sentences.


¶ 65  Affirmed.

*People v. Rowlands*, 2022 IL App (5th) 200221

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Effingham County, No. 19-CF-137; the Hon. Allan F. Lolie, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, and Christopher Sielaff, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | Bryan M. Kibler, State's Attorney, of Effingham (Patrick Delfino, Patrick D. Daly, and Timothy D. Berkley, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |